**RICE et al. v. STATE ex rel. SHORT, Atty. Gen.**

No. 15763—Opinion Filed Dec. 9, 1924.

Rehearing Denied Jan. 6, 1925.

Application to File Second Petition for Rehearing Denied Jan. 20, 1925.

(Syllabus.)

1. **Convicts—Right of State to Engage in Business of Manufacturing Shirts by Convict Labor.**

The business of manufacturing shirts by the state, in its penitentiary, by the use of convict labor, is for a public purpose, and is authorized by section 31 of art. 2 of the Constitution, providing that the right of the state to engage in any occupation or business for public purposes shall not be denied nor prohibited.

2. **Same.**

The state is entitled to the labor and services of its convicts while confined in its prisons, and has the authority to produce, by such labor, things of commercial value, and to sell and dispose of the commodity produced. In doing so, the state should be regarded as performing a governmental function, and not as being engaged in a purely private commercial transaction.

3. **Same—Validity of Contract with Shirt Manufacturer.**

A contract between the state and a shirt manufacturer, by which the state agrees to manufacture and sell to the manufacturer certain shirts, being sanctioned by the Constitution and statute, is not ultra vires.

4. **Same—Validity of Prison Revolving Fund.**

Sections 8660, 8661, and 8662, Comp. Stat. 1921, provide for the creation and expenditure of a state prison revolving fund, which is available for the purpose of installing and carrying on, in the penitentiary, any industry authorized by law. Such fund, or so much thereof as is necessary, is available for the purpose of establishing and maintaining such industry. Hence, the use of such fund, for said purpose, is not a misapplication of public funds, nor the expenditure of money for which no appropriation has been made.

5. **Same—Constitutional Law—Monopolies and Exclusive Privileges.**

A contract between the state and a shirt manufacturer by which the state agrees to manufacture and sell to the manufacturer certain work shirts does not create a monopoly in favor of the manufacturer within the meaning of section 32, art. 2 of the Constitution, which declares that perpetuities and monopolies are contrary to the genius of a free government and shall never be allowed. Neither is such contract violative of sections 11017 to 11053, inclusive, Comp. Stat. 1921, defining and declaring illegal certain monopolies, nor of section 51, art. 5 of the Constitution, prohibiting the Legislature from passing any law granting to any association, corporation or individual any exclusive rights, privileges, or immunities within this state.

6. **Same—"Contracting of Convict Labor."**

A contract between the state and a shirt manufacturer, by the terms of which the state agrees to install a shirt factory in its penitentiary, and to manufacture and sell to such manufacturer certain work shirts, manufactured by the state, from materials, and with machinery and equipment furnished by it, does not amount to the contracting of convict labor within the contemplation of section 2, art. 23 of the Constitution, prohibiting the contracting of convict labor.

Error from District Court, Oklahoma County; William H. Zwick, Judge.

Action by the State on relation of the Attorney General against Carl Rice and J. E. O'Neil, members of the State Board of Public Affairs. From a judgment in favor of the plaintiff, the defendants appeal. Reversed and remanded.

Cottingham, McInnis & Green and Frank G. Anderson, for plaintiffs in error.

George F. Short, Atty. Gen., and Clifford W. King, Asst. Atty. Gen. (Tom C. Waldrep, of counsel), for defendant in error.

Jones & Randolph, amici curiae.

NICHOLSON, J. This is a suit by the

state of Oklahoma on relation of George F. Short, Attorney General, seeking to perpetually enjoin Carl Rice and J. E. O'Neil, members of the State Board of Public Affairs, constituting the Board of Prison Control, from entering into a certain contract with the Cherokee Manufacturing Company, a corporation, organized and doing business under and by virtue of the laws of this state, whereby the state agreed to manufacture at the penitentiary, and sell to the Cherokee Manufacturing Company certain shirts. To the petition filed the defendants interposed a general demurrer, which was by the court overruled, and the defendants electing to stand thereon, the court entered its decree perpetually enjoining the defendants from acting under, or in anywise attempting to perform said contract, or any other contract of similar purport; from this decree the defendants have appealed.

The contract involved, omitting the formal parts, read as follows:

"Section 1. The state intends to engage in the business of the manufacture and sale of work shirts at its penitentiary or prison at McAlester, Okla., and it hereby agrees to sell to the company, and the company, hereby agrees to purchase from the state a minimum of three hundred (300) dozen and a maximum of four hundred (400) dozen work shirts daily (Sundays and legal holidays excluded), so long as this contract shall continue in existence, such shirts to be of the general style and of quality of material and manufacture as good as or better than the sample shirts which are hereto attached and made a part of this contract.

"Section 2. All shirts sold hereunder shall be delivered by the state to the company f. o. b. cars McAlester, Okla., packed and ready for shipment and the price therefor, subject to variations in prices for change in market cost of materials, as hereinafter set forth, shall be as follows:

"Chambray and indigo two pocket shirts, as per sample hereto attached and made a part of this contract, $6.01½ per dozen for coat shirts and $5.96½ per dozen for shirts other than coat shirts.

"Khaki and black twill or drill cloth two pocket shirts, as per samples hereto attached and made a part of this contract, $6.06½ per dozen for coat shirts and $6.01½ per dozen for shirts other than coat shirts.

"It is understood and agreed that the above prices are based upon a market cost for materials as follows: For cloth 28 inches wide, 13c per yd., and other widths in proportion; For trimmings, including material for packing, 50c per dozen shirts; and in the event of changes in market cost of such materials the price to be paid for shirts hereunder shall be increased or decreased, as the case may be, by an amount equivalent to the actual increase or decrease in cost of shirts due to such market changes; provided, however, the state at any time it shall so desire, shall have the right, from time to time, to elect to sell and deliver the shirts on a cost plus basis, in which event the following scale of prices shall govern: For chambray and indigo two pocket shirts, as per samples hereto attached 'cost of materials' as hereinafter defined plus 87c per dozen for coat shirts and 'cost of materials' as hereinafter defined plus 82c for shirts other than coat shirts. For khaki and black twill or drill cloth two pocket shirts, as per sample hereto attached and made a part of this contract 'cost of materials' as hereinafter defined plus 92c per dozen for coat shirts and 'cost of materials' as hereinafter defined, plus 87c for shirts other than coat shirts.

"Payment shall be made on the 15th day of each calendar month for all shirts sold and delivered hereunder during the preceding calendar month.

"Section 3. The phrase 'cost of materials' as used in section 2 of this contract shall be deemed to have the specific meaning, and shall be defined, as follows: Actual cost, after deduction of discounts taken on purchases, without addition for commission, if any paid, of all the things furnished pursuant to section 4 (a) of this contract, and actually used as a part of, or in the manufacture of, or in the packing and preparation for shipment, of shirts sold hereunder to the company during a given calendar month, —plus freight to McAlester, Oklahoma.

"Section 4. (a) The state shall furnish all materials, fabrics, cloth, buttons, thread and other articles used or intended for use in the manufacture of shirts and all labels, wrapping paper, twine, boxes and other articles used or intended for use in packing and preparing shirts for shipment hereunder; and at all times shall keep on hand in storage available for use in its business of manufacturing shirts to be sold to the company under this contract not less than the equivalent of four (4) weeks supply in addition to the goods in course of manufacture.

"(b) The materials and articles in this section mentioned shall be purchased at the lowest possible price and on the most favorable terms, and no purchase thereof shall be made until after the price and quality in each instance shall have been submitted to the company for its approval and shall have been approved by its authorized representative in writing provided the state may proceed with any such purchase without such approval as to price in any case when the company for a period of ten (10) days after the submission of such purchase to it shall fail either to approve the same or

to find and make available to the state at the same or a less price a sufficient supply of the article in question.

"(c) If at any time the board shall not have available sufficient funds to enable it to maintain a supply of the articles mentioned in paragraph (a) of this section, the company, upon request, agrees to furnish to the board all such articles necessary for the manufacture of the shirts hereby purchased. During such time the company shall pay for all shirts purchased hereunder the prices above specified except that the 'cost of materials' as defined in section 3 hereof shall not be included in such prices.

"Section 5. In addition to the shirts agreed to be sold and purchased hereunder, the company shall have the refusal of all other shirts which the state may manufacture for sale at said plant at the same price as offered by any other bidder, which refusal shall be exercised within thirty (30) days after the board shall notify the company in writing.

"Section 6. (a) The company has leased and by these presents does hereby lease and, let to the state for its use in its work shirt manufacturing plant the machinery, equipment, tools and articles which are set forth in detail in the schedule which is hereto attached, marked for its identification "Exhibit A" and made a part hereof. The term of this lease shall expire at the termination of this contract. This lease shall be for a monthly rental of $400, which shall be payable upon the 15th day of each calendar month; such rental shall be deducted each month by the company from the amount due the state hereunder.

"(b) Upon the termination of this contract the board agrees to surrender into the possession of the company all of the machinery, equipment, tools and articles hereby leased in the same condition as when the same were installed, ordinary wear and tear, damage or destruction by fire, flood, riots, acts of God or the elements or other causes not within the reasonable control of the state excepted; provided the state shall have the right at any time at or prior to the expiration of this agreement to purchase all of said things at invoice prices as per Exhibit 'A' hereto attached less depreciation at 10 % per annum from date of installation.

"(c) The title to all the machinery, equipment, tools and articles hereby leased and let at all times shall be and remain in the company, but the company shall bear all expenses of installation, maintenance, replacement and removal thereof. For the purpose of removing such machinery at the termination of this contract, the company shall have the right of access to the premises of the state at all reasonable times, but in the work of such removal shall do no unnecessary damage to any building or other property of the state.

"Section 7. The company shall have the right to place inspectors at the plant of the state for the purpose of the company's assurance that shirts manufactured for sale to the company shall be of the proper quality. Such inspectors at all times while on the premises of the state shall be subject to such regulations as the warden or the board may promulgate.

"Section 8. This contract shall continue in effect for a period of seven (7) years from and after the date of its execution, provided, however, that in the event of future federal regulation forbidding the transportation of prison made work shirts in interstate commerce or requiring that such work shirts be labeled to show their source of origin before being removed in interstate commerce, the company shall have the right to terminate this contract upon sixty (60) days' notice in writing to the board; and further in the event of any other legislation, state or federal, which the board in good faith shall find to be unfavorable to the sale or transportation of work shirts sold under this contract, the company shall have a like right to terminate this contract on like notice.

"Section 9. In the event the validity of this contract shall be questioned in any action commenced in any court of law or equity, then each of the parties hereto shall be permitted at its option to delay further performance of this contract until this contract shall be finally adjudged valid by the Supreme Court of Oklahoma, if appealed; but all machinery and equipment shall be installed ready for operation within fifty days after date of such judgment.

"Section 10. No liability shall accrue against either of the parties hereto in favor of the other for any delay in the performance of any covenant or obligation of this contract caused by fires, riots, strikes, car shortage, acts of God and the elements, or other causes beyond the reasonable control of such parties.

"Section 11. The company herewith tenders a bond in the sum of $25,000 subject to the approval of the board, conditioned upon the faithful performance by the company of its covenants and obligations hereunder and upon the prompt payment by the company of all accounts which from time to time it may owe the state hereunder.

"Section 12. This contract in all things shall be binding upon the successors, assigns and successors in office of the parties hereto; but the company shall not assign the same without the consent of the board and any assignment made without such consent shall be void at the option of the board."

In its petition the state assails this contract on the following grounds:

(1) That it violates section 2 of art.

23 of the Constitution, prohibiting the contracting of convict labor.

(2) That it does not constitute the exercise of a governmental function for which the state is authorized to use prison labor.

(3) That it is in violation of the laws of the state, including section 32, art. 2 of the Constitution in that it creates a monopoly in favor of the company to the extent of the privileges granted therein.

(4) That it is in violation of section 31, art. 2 of the Constitution in that it is subversive of the spirit and intention of said section, providing that the state may engage in any occupation or business for public purposes, and that the manufacture of shirts by the use of convict labor in competition with free labor, not being a public purpose, is not within the terms of said section.

(5) That it is in violation of the Constitution and laws of the state in that to the extent of its terms it grants an exclusive privilege and stifles competition.

(6) That it is not authorized by express provision of law, and is therefore ultra vires.

(7) That it amounts to the misapplication of public funds and the expenditure of money for which no appropriation has been made.

In determining the validity or invalidity of this contract, it is necessary to ascertain whether it is in violation of either the letter or spirit of the Constitution, for if it violates either of these, it must be held invalid.

In section 1 of this contract, it is recited that the state intends to engage in the business of the manufacture and sale of work shirts at its penitentiary at McAlester, so the first inquiry is, Has the state the power to engage in this business?

Section 31 of art. 2 of the Constitution provides that the right of the state to engage in any occupation or business for public purposes shall not be denied or prohibited, except that the state shall not engage in agriculture for any other than educational and scientific purposes, and for the support of its penal, charitable, and educational institutions. By this provision, the state is prohibited from engaging in the business of agriculture except for the purposes named, but it may engage in any other business, if such business is for a public purpose.

By section 9228. Comp. Stat. 1921, the State Board of Public Affairs is given the management and control of the penal institutions of the state located at McAlester and Granite, and said board is granted the authority to install and equip such business enterprises, occupations, factories, manufactories, farming, and any other business not prohibited by the Constitution, as will employ the inmates of said institutions. This section of the statute confers upon the board the power and authority to engage in any business not prohibited by the Constitution, and the Constitution does not prohibit any business for public purposes, except agriculture. Therefore, if the business mentioned in the contract is for a public purpose, it finds sanction in the constitutional provision above referred to.

In determining whether or not the business is for public purposes, we must bear in mind that the penitentiary is a state institution, maintained by the state in its sovereign capacity; that the expense of maintaining such institution is borne by the people through the avenues of taxation; that this institution is indispensable to the state government; without it the penal laws of the state could not be enforced, society would be imperiled and state government would crumble. The inmates of this institution are charges of the state, many of whom have been sentenced to hard labor during the term of their incarceration; but regardless of the law's mandate in this regard, it is necessary that those confined be employed, not only for their health, welfare, and contentment, but to promote discipline in the institution; this being true, it is necessary that employment of some kind be provided, and it is the purpose of the contract under consideration to provide such employment. The fact that such employment may produce a commodity to be sold on the market in competition with goods produced by free labor does not render the purpose a private one. The state is entitled to the labor and service of its convicts while confined in its prisons, and has the authority to produce by such labor things of commercial value. This right must be conceded, and having this right, it necessarily follows that the state has the implied power to sell and dispose of the commodity produced. In so doing, the state should be regarded as performing a governmental function, and not as being engaged in a purely private commercial transaction. See In re Western Implement Co., 166 Fed. 576, 171 Fed. 81, and Shenandoah Lime Co. v. Mann (Va.) 80 S. E. 753: Furthermore section 36 of art. 5 of the Constitution de-

clares that the authority of the Legislature shall extend to all rightful subjects of legislation, and the Legislature has by the provisions of the statute above referred to, provided for the establishment in the penitentiary of such business as is contemplated by the terms of the contract. The Legislature has thus construed its functions in this connection, and that construction, while not controlling, indicates that the Legislature considered such business to be for a public purpose. This is a rightful subject of legislation, and while a purely private enterprise could not by legislative enactment be converted into a business for public purposes, yet the Legislature had the power to provide for the establishment in the penal institutions of the state of business enterprises or occupations which will furnish employment to the inmates of those institutions and these enterprises are in their very nature for public purposes, and must be so held.

What we have already said answers in a large measure, if not completely, the contention that the contract is ultra vires and void, for by the constitutional provisions above referred to the right of the state to engage in any occupation or business for public purposes shall not be denied or prohibited.

We have seen that the business provided for under the contract is for a public purpose, and that the State Board of Public Affairs is by statute granted authority to install and equip such business enterprises, factories, manufactories, farming, and other business, not prohibited by the Constitution, as will employ the inmates of said institutions. This grant of authority is general, and carriers with in everything reasonably necessary to make it effective. M., O. & G. Ry. Co. v. State, 29 Okla. 640, 119 Pac. 117. The contract finds sanction in both the Constitution and statute, and is not ultra vires.

Concerning the allegation that the contract amounts to the misapplication of public funds, and the expenditure of money for which no appropriation has been made, it is only necessary to refer to sections 8660, 8661, and 8662, Comp. Stat. 1921, which provide for the creation and expenditure of a state prison revolving fund for the penitentiary and reformatory; such fund for such respective institutions to be separately kept, and each of said funds to be available for the purpose of carrying on any industry expressly authorized by law to be carried on at said prisons or either of them. These funds consist of any appropriation made for such purpose and include all net earnings and net profits of all business enterprises, occupations, factories, shops, manufactories, farming, or any other business conducted or carried on in or by said prison through their respective officers under the supervision of the State Board of Public Affairs. These funds shall be separately kept in such a way as to show from what industry or what particular business such fund is derived. With the approval of the Governor, in writing, part of said revolving fund may be used in carrying on another or different enterprise for said prison or prisons, other than that business or industry from which it was derived; said fund or funds shall be used for the purchase of materials necessary to be used in such business enterprise, occupation, factory, or any other business carried on at such prisons, and in payment of all other expenses necessary and proper in the conduct of such business or enterprise, and for such other purpose as may be authorized by law, and as especially authorized by section 31, art. 2 of the Constitution.

It will thus be seen that the funds for the establishment and conduct of the business contemplated by the contract have been provided by law, and that the board has the authority under the statute to expend these funds for the purposes mentioned.

The charge that this contract is in violation of the laws of the state, including section 32, art. 2 of the Constitution, in that it creates a monopoly in favor of the Cherokee Manufacturing Company to the extent of the privileges granted therein, and declared by said section to be contrary to the genius of a free government is, it seems to us, without foundation. The section of the Constitution referred to provides that perpetuities and monopolies are contrary to the genius of a free government, and shall never be allowed. This provision should be read in connection with section 44, art. 5 of the Constitution, which is that:

"The Legislature shall define what is an unlawful combination. monopoly, trust, act or agreement, in restraint of trade, and enact laws to punish persons engaged in any unlawful combination monopoly. trust, act or agreement, in restraint of trade, or composing any such monopoly, trust or combination."

In compliance with this constitutional requirement, the Legislature has, by sections 11017 to 11053 (inclusive), Comp. Stat. 1921, defined and declared illegal, certain monopolies. Section 11017, supra, providing that:

"Every act, agreement, contract or combination in the form of trust, or otherwise, or conspiracy in restraint of trade or commerce within this state, which is against public policy, is hereby declared to be illegal."

It will thus be observed that the Legislature recognized what, no doubt, was in the minds of the framers of the Constitution, that the monopolies denounced by the Constitution are those which have for their purpose infringement upon the freedom of trade.

It cannot be said that the contract under consideration contains any feature or discloses any intent to restrict trade. It is not attempted to control the supply or demand for either shirts or the material of which they are made. We fail to see in this contract any element of monopoly which does not arise in the ordinary transaction of sale and purchase. This contract merely provides for the sale to the Cherokee Manufacturing Company of a certain quantity of shirts, manufactured by the state, such quantity being of no importance when compared to the volume of shirts sold by the garment industry, and having little or no effect upon the general trade in like garments. It is doubtful if anyone would have the temerity to assert that this contract, if entered into between private concerns, would be in violation of any constitutional or statutory provision, and yet there is no distinction between the rights, duties, and liabilities of the state in this regard and those of a private individual. While the proposed manufacture and sale of shirts at the penitentiary is for public purposes, and is incident to the exercise of the governmental function relating to the control of penal institutions, nevertheless the actual business is not in itself governmental but in the language of section 31, art. 2 of the Constitution, is an "occupation or business," and the conduct of such business is to be tested and governed by those limitations which apply to private individuals engaged in the same business. Cook et al. v. United States, 91 U. S. 389, 23 L. Ed. 237; United States v. Bostwick, 94 U. S. 53, 24 L. Ed. 65; United States v. Commercial Co., 74 Fed. 145; see, also, Fretz v. City of Edmond, 66 Okla. 262, 168 Pac. 800. It follows that the contract does not create a monopoly within the meaning of the Constitution and statute.

Neither is the contract violative of the Constitution and laws of the state in that it grants an exclusive privilege and stifles competition. Section 51, art. 5 of the Constitution provides:

"The Legislature shall pass no law granting to any association, corporation or individual any exclusive rights, privileges or immunities within this state."

It is not contended that the Legislature has passed a law granting special privileges to the Cherokee Manufacturing Company or anyone else. All that the Legislature has done is to authorize the state to establish factories, etc., in its penitentiary, and the fact that the contract provides for the sale of the product of one of these factories to the company does not amount to a grant to it of an exclusive right, privilege, or immunity within the meaning of the constitutional inhibition.

This brings us to a consideration of the most difficult question presented, and the one upon which the Attorney General and amici curiae have directed the burden of their argument, that is, that the contract is in violation of section 2, art. 23 of the Constitution, which provides: "The contracting of convict labor is hereby prohibited."

We have already seen that the state has the right, under the Constitution and statute, to engage in the business contemplated, this for the reason that such business is for a public purpose, so the pertinent inquiry presented by the argument is whether the state proposes in good faith to embark in the business of manufacturing and selling work shirts, or whether the real object of the contract is the contracting of convict labor.

In approaching this question, it must be borne in mind that the petition nowhere charges the State Board of Public Affairs with bad faith in entering into this contract, but so far as the allegations of this petition are concerned, the contract is what, on its face, it purports to be, yet the Attorney General and amici curiae, without charging fraud or bad faith on the part of the board, would have us hold that the aim and purpose of the parties is the contracting of convict labor; that the contract is not, in fact, what its terms indicate, but it is merely a cloak fashioned to cover up the real transaction, and thus circumvent the constitutional provision prohibiting contracting of convict labor.

The Attorney General relies chiefly upon the case of Price v. Mabey et al., 218 Pac. 724, wherein the Supreme Court of Utah held void a contract between the State Board of Corrections and an overall and

shirt manufacturer providing for the installation by the manufacturer of manufacturing equipment in the state prison, and the purchase by the manufacturer from the state of all shirts and overalls manufactured therein, with prison labor, out of materials furnished by the manufacturer; the court finding that such contract violated the constitutional provision prohibiting the contracting of convict labor, as well as certain statutory provisions of the state.

The contract there involved and the one here under consideration have many distinguishing features; there, the state agreed to furnish nothing but labor. As stated by the court:

"What does the state agree to supply under this contract with the Pioneer Garment Company? It supplies neither machinery nor goods. Incidentally it furnishes a building, light, heat, and air, but the main thing is labor; it is labor only that the agreement gives the Garment Company from the state, and it is convict labor only which the Garment Company pays for. Reduced to its simplest form the contract provides for the furnishing of labor by the state, and for the payment of that labor by the contractors."

Under the terms of the contract here involved, the state furnishes the machinery, equipment, and all material used, as well as all labor, such labor being performed within the prison walls and under the direct control of the state. The manufactured article remains the property of the state until delivered f. o. b. McAlester; true, the machinery is leased from the Cherokee Manufacturing Company, but at a substantial rental with an option to purchase at a stipulated price, less an agreed depreciation. This contract does not, as did the Utah contract, clearly show that its purpose is solely the contracting of convict labor; furthermore the Utah court in the more recent case of Utah Mfrs. Ass'n v. Mabey et al., Board of Corrections, 226 Pac. 189, held that a resolution providing for the establishment of a prison garment factory was not violative of the constitutional provision prohibiting the contracting of convict labor, and the labor of convicts outside prison grounds except on public works, etc., because the phrase "contracting convict labor" had relation to the previous custom of leasing or hiring out of convict labor. In commenting upon the case of Price v. Mabey, supra, the court said:

"We are clearly of the opinion that nothing proposed in the resolution is prohibited by this section of the Constitution. Neither do we think the opinion in Price v. Mabey, supra, is determinative of the question here presented. The conclusions in that case were based wholly upon the fact that the court was of the opinion that the contract then before the court, and which was proposed to be carried into effect, was violative of this provision of the Constitution, in that it amounted to hiring convict labor to a corporation not under the control or management of the state or its officials. The resolution of March 28th specifically provides that the work proposed is to be done upon the prison grounds and under the direct control of the state."

It will thus be seen that the Utah court has in a large measure receded from its former position.

Much has been said both in the briefs and oral argument pertaining to the purpose of the framers of the Constitution in prohibiting the contracting of convict labor; it being the contention of the Attorney General and amici curiae that said provision was written for the purpose of preventing convict labor from coming into competition with free labor. If this was the intention of the framers of the Constitution, then, of course, the employment of convict labor in any occupation competing with free labor would violate the spirit of the Constitution and would be prohibited thereby.

We have not been favored with a record of the discussion of this subject in the Constitutional Convention, but are unwilling to attribute to the framers of the Constitution the motive assigned by counsel. If the members of the Constitutional Convention had had in mind the protection of free labor from competition with convict labor, they doubtless would have expressed such purpose in clear and unequivocal language. We are convinced that those who drafted our Constitution had in mind the evils flowing from the practices then existing in some states of leasing or farming out convicts to individuals, or private corporations; such practices resulting in untold cruelty to the prisoners, and little or no benefit to the state, and which practices engendered such opposition and public criticism that most of the states of the Union had, prior to the adoption of the Constitution of this state, prohibited officers from entering into contracts for the labor of prisoners. We feel sure that the framers of our Constitution, in prohibiting the contracting of convict labor, were moved by the spirit of mercy and that their object was to protect those unfortunate ones who might be deprived of their liberty by the mandate of the law, from brutality and oppression, that they were actuated by a desire to relieve as much as possible the suffering of those confined, as well as to prevent the inauguration of a system which

had met with such disfavor throughout the nation. We cannot believe that the Constitution makers had in mind the protection of free labor from competition with convict labor. Had they so intended, they would have said so. We heartily agree with the sentiment expressed in Henry v. State, 87 Miss. 1, 39 South. 856 (875), wherein it was said:

"It will, I apprehend, fall as a distinct shock on the ear of the humanity loving people of the state to hear the statement solemnly made that the framers of the Constitution, in inaugurating the scheme prohibiting the hiring of convicts, were not moved by the God-given spirit of mercy to protect the unfortunate criminals from brutality and oppression, but by the petty, pitiful, sordid design of precluding the possibility of the labor to which the convicts for their punishment and the good of society are sentenced proving of benefit to any private citizen. I earnestly and emphatically repudiate the suggestion. Clothed in sophistry, partially concealed by the flowers of rhetoric, though it may be, the idea is an unwarranted aspersion of the motives of the broad-minded patriotic statesmen who composed the membership of the Constitutional Convention."

Having concluded that it was not the purpose of the Constitution to prohibit convict labor from coming into competition with free labor, it cannot be said the contract is invalid because the product of the labor of convicts may be placed upon the market in competition with like articles produced by free labor. One cannot read this contract and say that by its terms the state is contracting convict labor to the Cherokee Manufacturing Company. It may be, as contended by the amici curiae, that this is the true purpose, but we must construe the contract according to its terms. We are not justified, in the absence of a charge of fraud or bad faith, in looking beyond the plain terms of the contract to find some excuse for declaring it invalid. Suppose we were to push back the curtain that it is claimed conceals the real intent and purpose of the contract in an effort to reveal the true purpose thereof, what would we find? We would find merely a contract of bargain and sale, not one for the contracting of convict labor. We would find a contract sanctioned by the Constitution and laws of the state, and one that must be construed as meaning what it says. We are not prepared to say that the parties to this contract meant other than what they have said therein, or that it is not their purpose to carry out its terms. Particularly is this true where there is no showing of fraud, and where we must presume that the parties were acting in good faith.

If the policy of the state in maintaining factories and other business enterprises in its penal institutions in competition with the citizens of the state engaged in like enterprises is wrong, the evil must be remedied by the Legislature, and not by the courts.

It follows that the judgment of the trial court must be reversed, and the cause remanded, with directions to sustain the demurrer to the petition.

BRANSON, LYDICK, MASON, WARREN, and GORDON, JJ., concur.

McNEILL, C. J. dissents. JOHNSON and HARRISON, JJ., absent and not participating.

Note.—See under (1) 13 C. J. p. 923, § 20 (1926 Anno): (2) 13 C. J. §§ 20 (1926 Anno), 33 (1926 Anno); (3, 4, 6) 13 C. J. § 33 (1926 Anno); (3, 4, 6) 13 C. J. § 33 33 (1926 Anno); (6) 27 C. J. p. 893 (1926 Anno).