Dear Representative Collins:
This office has received your request for an official Attorney General Opinion in which you ask, in effect, the following question:
 Because the Transformational Justice Act, 2007 Okla. Sess. Laws ch. 274, §§ 1-3, authorizes government money to be used to provide funds to faith-based groups for specified services, does it violate the federal or state Constitutions?
In 2007, the Oklahoma Legislature enacted a new section of law to be known as the Transformational Justice Act ("Act"). 2007 Okla. Sess. Laws ch. 274, § 1.[1] In the Act, the Legislature created the Reentry Policy Council "for the purpose of providing oversight of the reentry policies and programs operated by the Department of Corrections." 57 O.S. Supp. 2007, § 521.1[57-521.1](A). The Reentry Policy Council is charged with reviewing policies and procedures, identifying gaps in reentry programs and services, recommending changes, and reporting to the Legislature and the Governor. Id. § 521.1(B).[2] *Page 2 
The Act creates in the State Treasury a revolving fund designated the Reintegration of Inmates Revolving Fund ("Fund"). Id. § 521.2(D). The Fund consists of appropriated dollars[3] to be used for "grants to volunteer organizations including, but not limited to, faith-based organizations which provide health, educational or vocational training and programs that assist the reintegration efforts of the Reentry Policy Council." 2007 Okla. Sess. Laws ch. 234, § 7. The Act provides monies in the Fund are to be budgeted and expended by the Office of Faith-Based Initiatives. Id. However, in a recent Attorney General Opinion we said the Department of Human Services Director, subject to approval of the Commission for Human Services, shall budget and expend funds appropriated to the Department for the Fund, and the Director may use the Office of Faith-Based and Community Initiatives to carry out these functions. A.G. Opin. 08-02, 2008 WL 538490 at *3 (West Westlaw).
You ask if the Act's provision which allows state-appropriated monies in the Fund to be used for grants to faith-based organizations violates the federal or state Constitutions. We first analyze this provision of the Act under the Establishment Clause of the federal Constitution.
 I. Analysis of the Act Under the Federal Constitution
A: Facial Validity of the Act
The Establishment Clause of the First Amendment to the United States Constitution provides simply that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend.1. The Establishment Clause applies to the states through the Due Process Clause of the Fourteenth Amendment.See Everson v. Bd. of Educ., 330 U.S. 1, 8 (1947).
The United States Supreme Court has acknowledged the Establishment Clause analysis is not always clear cut, saying, "candor compels the acknowledgment that we can only dimly perceive the boundaries of permissible government activity in this sensitive area." Mitchell v.Helms, 530 U.S. 793, 807 (2000) (quoting Tilton v. Richardson,403 U.S. 672, 678 (1971)). However, one thing is clear: "[t]he simplistic argument that every form of financial aid to church-sponsored activity violates the Religion Clauses was rejected long ago in Bradfield v.Roberts, 175 U.S. 291, 20 S.Ct. 121, 44 L.Ed. 168 (1899)." Tilton,403 U.S. at 679. "[R]eligious institutions need not be quarantined from public benefits that are neutrally available to all." Roemer v. Bd. ofPub. Works, 426 U.S. 736, 746 (1976).
In reviewing the history of the Supreme Court's Establishment Clause jurisprudence, the Court, in Everson, said: *Page 3 
 The `establishment of religion' clause of the First
Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever from [sic] they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa.
Everson, 330 U.S. at 15-16.
The Supreme Court has sustained direct financial assistance to church-affiliated organizations, provided the three-part test set forth in Lemon v. Kurtzman, 403 U.S. 602 (1971) has been satisfied. See, e.g.,Bowen v. Kendrick, 487 U.S. 589, 599 (1988) (aid to religious institutions); Roemer, 426 U.S at 748 (aid to church-affiliated college). In Lemon, the Court prescribed its tripartite test for evaluating the constitutionality of governmental actions under the Establishment Clause: first, the actions must have a secular purpose; second, the actions must not have a primary effect that advances or inhibits religion; third, the actions must not foster excessive governmental entanglement with religion. Id. at 612-13.
In Roemer, the Court made it clear that a religious organization may participate in public programs of a secular nature on the same basis as non-sectarian organizations. Id. at 746. The Court upheld the constitutionality of grants to church-related colleges so long as the grants were not used for sectarian purposes. Id. In a plurality opinion, Justice Blackmun said, "[i]t long has been established . . . that the State may send a cleric, indeed even a clerical order, to perform a wholly secular task." Id. The Court rejected the notion that "a religious person can never be in the State's pay for a secular purpose," (id.) and even suggested that exclusion because of religion would itself be unconstitutional. Id. n. 13.
The Supreme Court's decision in Bowen provides instruction for our Establishment Clause analysis of the Act. In Bowen, a group of taxpayers, clergymen, and the American Jewish Congress brought an action challenging the Adolescent Family Life Act ("AFLA"), which established a federal grant program to fund services relating to adolescent sexuality and pregnancy, as violating the Establishment Clause. Bowen,487 U.S. at 593. The AFLA declared that the problems of adolescent premarital sexual relations, pregnancy, and parenthood "`are best approached through a variety of integrated and essential services provided to adolescents and their families by other family members, religious and charitable organizations, voluntary associations, and other groups in the private sector as well as services provided by publicly sponsored initiatives.'" Id. at 595 (quoting 42 U.S.C. § 300z(a)(8)(B)). *Page 4 
The Court held AFLA was not facially unconstitutional, and whether or not AFLA was unconstitutionally applied required further proceedings.Id. at 593. The Court assessed the facial constitutionality of AFLA pursuant to the Lemon test. Under Lemon's first prong, the Court found, "it is clear from the face of the statute that the AFLA was motivated primarily, if not entirely, by a legitimate secular purpose-the elimination or reduction of social and economic problems caused by teenage sexuality, pregnancy, and parenthood." Id. at 602. There was no indication Congress's "`actual purpose' in passing the AFLA was one of `endorsing religion.'" Id. at 604.
The Court said the more difficult question was whether the primary effect of AFLA was to advance religion-Lemon's second prong. Id. One way in which direct government aid might have the effect of advancing religion is if the aid flows to "pervasively sectarian" institutions.[4]Id. at 610. The Court found nothing on the face of AFLA indicated a significant portion of federal funds would be disbursed to "pervasively sectarian" institutions. The likelihood that some of the AFLA-funded religious institutions agreed with the message Congress intended to deliver to adolescents did not have the primary effect of advancing religion. Id. at 613. The advancement of religion by AFLA was, at most, incidental and remote:
 Nothing in our previous cases prevents Congress from making such a judgment or from recognizing the important part that religion or religious organizations may play in resolving certain secular problems. Particularly when, as Congress found, "prevention of adolescent sexual activity and adolescent pregnancy depends primarily upon developing strong family values and close family ties," § 300z(a)(10)(A), it seems quite sensible for Congress to recognize that religious organizations can influence values and can have some influence on family life, including parents' relations with their adolescent children. To the extent that this congressional recognition has any effect of advancing religion, the effect is at most "incidental and remote."
Id. at 607.
Finally, the Court analyzed the third prong of the Lemon Establishment Clause test to determine if AFLA led to an excessive entanglement between church and state.[5] The Court said the Secretary of *Page 5 
Health and Human Services would no doubt review the programs set up and run by the AFLA grantees; however, such grant monitoring does not amount to excessive entanglement where the grants will be made to religiously-affiliated organizations that are not pervasively sectarian.Id. at 616-17.
Since the Court rendered its decision in Bowen, the Court has recastLemon's third prong entanglement inquiry-that legislation must not foster excessive entanglement between church and state-as simply one criterion relevant to determining the Lemon test's second prong-whether the statute's primary effect advances or inhibits religion. Mitchell,530 U.S. at 808 (citing Agostini v. Felton, 521 U.S. 203, 232-33
(1997)).
In analyzing the Act using the Lemon test, as modified by Agostini, the Act does not violate the Establishment Clause of the federal Constitution. Under Lemon's first prong, it is clear from the face of the Act it was motivated primarily, if not entirely, by a legitimate secular purpose-to assist the reintegration efforts of the Reentry Policy Council in reintegrating inmates into communities.
As to Lemon's second prong, the primary effect of the Act, on its face, cannot be said to advance religion. In Bowen, the Court acknowledged that only in the context of aid to pervasively sectarian institutions, such as parochial schools, had the Court found facially unconstitutional an aid program because there was a "substantial" risk that aid would, knowingly or unknowingly, result in religious indoctrination. Bowen, 487 U.S. at 612. Nothing on the face of the Act indicates a significant portion of the State funds will be disbursed to "pervasively sectarian" institutions; therefore, the Act does not have the primary effect of advancing religion.
Attorneys General in other states have reached similar conclusions.See, e.g., Va. Op. Att'y Gen. 06-052 (2006), 2006 WL 4286448, at * 5 (state funding of faith-based rehabilitation programs for inmates meets all three prongs of the Lemon test, as clarified in Agostini); Tenn. Op. Att'y Gen. 04-067 (2004), 2004 WL 1009390, at ** 3, 4 (legislation requiring state and local governments to contract for goods and services with religious organizations on the same basis as other non-government providers does not, on its face, violate the Establishment Clause).
B: Constitutional Validity of the Act, As Applied
We are unable to address whether the Act, as applied, violates the Establishment Clause of the federal Constitution, as that would constitute a question of fact beyond the scope of an Attorney General Opinion. 74 O.S. 2001, § 18b[74-18b](A)(5). However, discussion of cases determining the constitutional validity of government aid programs, as applied, may be helpful in guiding the administration of the Act's grant program.
In Bowen, the Supreme Court decided only the facial validity of AFLA under the Establishment Clause, leaving the constitutional validity of the Act, as applied, to the district court on remand. Id. at 621. However, the Court gave some guidance to the lower court, saying it should consider the following to determine if the application of AFLA violated the Establishment Clause: (1) "whether in *Page 6 
particular cases AFLA aid has been used to fund `specifically religious activit[ies] in an otherwise substantially secular setting,'" and (2) "whether the Secretary [of Health and Human Services] permitted AFLA grantees to use materials that have an explicitly religious content or are designed to inculcate the views of a particular religious faith."Id. (citation omitted).
In determining the constitutional validity of government aid the Supreme Court has drawn a consistent distinction between government programs that provide aid directly to religious institutions as in Bowen
and programs in which government aid reaches religious institutions only as a result of the genuine and independent choices of private individuals. Zelman v. Simmons-Harris, 536 U.S. 639, 650 (2002) (program which provided tuition aid to attend participating public or private schools of parents' choosing did not violate the Establishment Clause). In cases of individual choice, whether government funds are used to fund religious activities or explicitly religious materials is not in issue.Zelman stated:
 [W]here a government aid program is neutral with respect to religion, and provides assistance directly to a broad class of citizens who, in turn, direct government aid to religious schools wholly as a result of their own genuine and independent private choice, the program is not readily subject to challenge under the Establishment Clause. . . . The incidental advancement of a religious mission, or the perceived endorsement of a religious message, is reasonably attributable to the individual recipient, not to the government, whose role ends with the disbursement of benefits.
Id. at 652.
In Americans United for Separation of Church and State v. PrisonFellowship Ministries, Inc., 509 F.3d 406, 425 (8th Cir. 2007), the Eighth Circuit Court of Appeals evaluated a pre-release rehabilitation program for inmates and found it violated the Establishment Clause. The court's decision identifies problems that should be avoided in government aid programs such as the grant program established by the Act. Id.
In Prison Fellowship Ministries, the Iowa Department of Corrections ("IDOC") faced budgetary constraints and looked for innovative ways to meet programming needs. Id. at 416. IDOC issued a request for a proposal to establish a non-compensated, values-based, pre-release program at one of its prison facilities. Id. at 417. InnerChange and its affiliate Prison Fellowship submitted the only proposal. Id. In the years 2000 to 2004, IDOC contracted for program services with reimbursement made to InnerChange for non-religious costs and expenses. Id. at 425. In years 2005 to 2007, in an attempt to make InnerChange an indirect aid program, the contract changed to a per diem payment of $3.47 for each inmate participating in the program. Id. at 417, 425.
The court used the three-part Lemon test and found the direct aid to InnerChange in years 2000 to 2004 violated the Establishment Clause.Id. at 425. The court said the aid was for a secular purpose, to reduce recidivism, and there was no excessive entanglement between InnerChange and IDOC because there was no pervasive monitoring by IDOC. Id. However, the aid violated the second prong *Page 7 
of the Lemon test. The aid had the effect of advancing religion because inmates had to be "`willing to productively participate in a program that is Christian-based.'" Id. The court said the program was "dominated by Bible study, Christian classes, religious revivals, and church services."Id. at 424. The court also noted that inmates who enrolled in the InnerChange program were housed in an area that afforded residents greater privacy, allowed more family visits, and had access to computers, not otherwise accessible to non-participating inmates. Id.
The court also found the per diem payments to InnerChange in years 2005 to 2007 violated the Establishment Clause. Id. at 426. The court said inmates had no "genuine and independent private choice." Id. at 425. The inmate could direct the aid only to InnerChange. Id. "The legislative appropriation could not be directed [by the inmate] to a secular program, or to general prison programs" equivalent to the InnerChange program, because no alternative secular programs were available. Id.
The Bowen and Prison Fellowship Ministries cases provide some indication of the facts a court might consider in determining if the Act's grant program is constitutionally applied. Based upon the Court's language in Bowen, a court would likely find the grant program established by the Act was unconstitutionally applied under the Establishment Clause of the federal Constitution if the grant program involved: (1) government aid which was used to fund specifically religious activities in an otherwise secular setting (id. at 609-10), (2) grantees which were permitted to use materials having explicitly religious content or designed to inculcate the views of a particular religious faith (id. at 621), or (3) inmates who participated in a sectarian program being treated more favorably than those who did not participate in a sectarian program (id. at 626). If the grant program involved indirect aid, a court that found persuasive the Eighth Circuit Court of Appeals' opinion in Prison Fellowship Ministries would likely find the inmates must have a genuine and independent choice between secular and sectarian programs to survive Establishment Clause scrutiny.
 II. Analysis of the Act Under the State Constitution
Having found the Act is facially valid under the Establishment Clause of the federal Constitution, we next analyze whether the provision of the Act which allows the Fund to be used for grants to volunteer organizations, including faith-based organizations, violates Article II, Section 5, or Article X, Sections 14(A) and 15 of the Oklahoma Constitution.
A: Facial Validity of the Act Under Article X, Sections 14(A) and 15of the Oklahoma Constitution
Any grant funds appropriated by the Legislature must be used only for a public purpose, and may not be used for a gift or loan of credit to a private person or entity. Okla. Const. art. X, §§ 14(A), 15.
The courts have long held that inmates are charges of the State and their well-being is a matter of public concern. Rice v. State ex rel.Short, 232 P. 807, 810 (Okla. 1924). *Page 8 
 [T]he penitentiary is a state institution, maintained by the state in its sovereign capacity; that the expense of maintaining such institution is borne by the people through the avenues of taxation; that this institution is indispensable to state government; without it, the penal laws of the state could not be enforced, society would be imperiled, and state government would crumble. The inmates of this institution are charges of the state . . .; it is necessary that those confined be employed, not only for their health, welfare, and contentment, but to promote discipline in the institution.
Id. at 810.
The Legislature has expressly found that faith-based programs in correctional institutions "have the potential to facilitate inmate institutional adjustment, to help inmates assume personal responsibility, and to reduce recidivism." 57 O.S.Supp. 2007, § 614[57-614].
In public funding cases, courts are required to give great deference to the Oklahoma Legislature's determination whether a particular project will serve a public purpose. In reviewing that determination, "courts cannot interfere to arrest legislative action where the line of distinction between that allowable and that which is not is faint and shadowy." Helm v. Childers, 75 P.2d 398, 399 (1938). "Such a determination should be reversed only upon a clear showing that it was manifestly arbitrary, capricious, or unreasonable." State ex rel. Brownv. City of Warr Acres, 946 P.2d 1140, 1144 (Okla. 1997).
By passing the Act, the Legislature necessarily determined that it would promote a legitimate public purpose to provide "health, educational or vocational training and programs that assist the reintegration efforts of the Reentry Policy Council" to reintegrate inmates into communities. 2007 Okla. Sess. Laws ch. 234, § 7. What constitutes a public purpose lies properly within the province of the Oklahoma Legislature. Helm,75 P.2d at 399. We therefore conclude the Act's provision for grants to volunteer organizations, including faith-based organizations, to provide health, educational or vocational training and programs that assist reintegration of inmates into communities, on its face, constitutes a public purpose and does not violate Article X, Section 14(A) of the Oklahoma Constitution.
"The constitutional provisions regarding public purpose [Section 14] and gifts [Section 15] are generally construed in conjunction with each other." See A.G. Opin. 01-30, at 135. A transfer of money based on a public purpose and adequate consideration is not a prohibited "gift." Wayv. Grand Lake Ass'n, 635 P.2d 1010, 1015-17 (Okla. 1981); Johnston v.Conner, 236 P.2d 987, 991 (Okla. 1951).
The face of the Act provides for the State to receive consideration for grant payments in the form of health, educational, and vocational training programs, which assist the reintegration efforts of the Reentry Policy Council. There is no indication on the face of the Act that such consideration is not adequate. A legislative act is presumed constitutional and will be upheld unless shown to the contrary. SeeFraternal Order of Police Lodge No. 165 v. City of Choctaw, 933 P.2d 261,266 (Okla. 1996). There is no indication on the face of the Act that the provision for grants to volunteer organizations, including faith-based organizations, to provide health, educational or vocational training and programs that assist reintegration of inmates into communities, constitutes inadequate consideration. Consequently, we cannot conclude from the face of the Act that the Act's grants are gifts which violate Article X, Section 15 of Oklahoma's Constitution.
B: Facial Validity Under Article II, Section 5 of the OklahomaConstitution
Article II, Section 5 of the Oklahoma Constitution states:
 No public money or property shall ever be appropriated, applied, donated, or used, directly or indirectly, for the use, benefit, or support of any sect, church, denomination, or system of religion, or for the use, benefit, or support of any priest, preacher, minister, or other religious teacher or dignitary, or sectarian institution as such.
 Id.[6]
Although the language of Article II, Section 5 of Oklahoma's Constitution would appear to prohibit payment of public funds to a sectarian institution, such is not the case. The Oklahoma Supreme Court has found payments to a sectarian institution for a public purpose and for adequate consideration does not violate Article II, Section 5. See,e.g., Murrow Indian Orphans Home v. Childers, 171 P.2d 600, 603 (Okla. 1946).
In Sharp v. City of Guthrie, 152 P. 403 (Okla. 1915), the court upheld a conveyance of property to a sectarian institution that was to be used as a university. Id. at 408. The court said the conveyance was for a public purpose and the value of the university to the city and the obligations and responsibilities assumed by the institution were sufficient consideration to uphold the conveyance. Id. The court said:
 The city having the right to sell the property, and the consideration being adequate, it would make no difference whether the grantee be a sectarian institution or not, for a sale upon a sufficient consideration would not be within the prohibition of section 5, art. 2, of the Constitution.
Id. *Page 9 
In Children's Home and Welfare Association v. Childers, 171 P.2d 613
(Okla. 1946), decided the same day as Murrow Indian Orphans Home, the Oklahoma Supreme Court found payments to sectarian institutions did not violate Section 5 of Article II of Oklahoma's Constitution. Id. at 614. The payments to residential children's homes for the care of orphan, dependent children, pursuant to contracts with the State Board of Affairs did not violate Article II, Section 5 of Oklahoma's Constitution because the payments were for a public purpose and the State received adequate consideration for payments to the institution in the form of the care of needy children, which the State had a duty to provide.Murrow Indian Orphans Home, 171 P.2d at 603.[7]
The analysis of a state-aid program under Article II, Section 5 is virtually identical to the analysis utilized by the courts in determining the constitutionality of a state-aid program under Article X, Sections 14(A) and 15 of the Oklahoma Constitution. A state-aid program will survive a constitutional challenge if state aid is for a public purpose and the State receives adequate consideration for the aid provided. We have found the Act's provision for grants to volunteer organizations, including faith-based organizations, to provide health, educational or vocational training, and programs to assist reintegration of inmates does not, on its face, violate Article X, Sections 14(A) and 15 of the Oklahoma Constitution. Therefore, the Act's provision for grants does not on its face violate Article II, Section 5 of the Constitution.
C: Validity of the Act, as Applied, Under Article II, Section 5, andArticle X, Sections 14(A) and 15, of the Oklahoma Constitution
In discussing the facial validity of the Act, we found the Act, on its face, did not violate Article II, Section 5, or Article X, Sections 14(A) and 15 of the Oklahoma Constitution because the Act furthered a public purpose, and we could not conclude the State would receive inadequate consideration in exchange for the grants made to volunteer organizations. Whether the Act is constitutionally applied requires a determination of whether or not the State receives adequate consideration for the grants made to volunteer organizations. Whether the consideration the State actually receives is adequate constitutes a question of fact beyond the scope of an Attorney General Opinion. 74 O.S. 2001, § 18b[74-18b](A)(5). However, discussion of Oklahoma cases determining the constitutional validity of government aid programs, as applied, may be helpful in guiding the administration of the Act's grant program. *Page 10 
In Way, the court upheld a financial claim submitted to the Department of Tourism and Recreation ("Department") by the Grand Lake Association, Inc. ("Association"), an Oklahoma nonprofit corporation, finding payment of the claim did not violate Oklahoma's Constitution in that the payment was for a public purpose and did not constitute an unconstitutional gift. Id. at 1016-18.
The claim was submitted by the Association pursuant to a line-item appropriation made to the Department specifically for the benefit of the Association.[8] Id. at 1013. The court found the conditions and governmental safeguards and controls that were legislatively mandated were as stringent and detailed as a contract with the state, and were in the nature of a unilateral contract between the Department and the Association. Id. at 1018. Consequently, payment to the Association did not constitute a gift in violation of Section 15 of Article X of Oklahoma's Constitution, because the State received adequate consideration for its payment.
The court's language in Way gives some indication what a court may consider in determining the adequacy of consideration the State receives for the Act's grant payments. Based on the court's language in Way, a court will likely find the grant program established by the *Page 11 
Act was constitutionally applied under Article II, § 5, and Article X, §§ 14(A) and 15, of Oklahoma's Constitution, if the State actually receives adequate consideration for the Act's grant payments. To ensure the State receives consideration for grant payments, a court will likely look for conditions and governmental safeguards and controls to be in place to ensure the grantees are performing and the State actually receives adequate consideration for the aid it provides.
It is, therefore, the official Opinion of the Attorney Generalthat:
 1. The Transformational Justice Act, 57 O.S.Supp. 2007, §§ 521.1[57-521.1], 521.2, which authorizes the State to provide funds to faith-based groups for specified services does not, on its face, violate the Establishment Clause of the federal Constitution.
 2. Whether the Transformational Justice Act, 57 O.S. Supp. 2007, §§ 521.1[57-521.1], 521.2, as applied, violates the Establishment Clause of the federal Constitution is a question of fact beyond the scope of an Attorney General Opinion. 74 O.S. 2001, § 18b[74-18b](A)(5).
 3. Based on the Court's language in Bowen v. Kendrick, 487 U.S. 589 (1988), a court would likely find the grant program established by the *Page 12 Transformational Justice Act, 57 O.S.Supp. 2007, §§ 521.1[57-521.1], 521.2, was unconstitutionally applied under the Establishment Clause of the federal Constitution, if the grant program involved direct aid to religious organizations and (1) the government aid was used to fund specifically religious activities in an otherwise secular setting; (2) the grantees were permitted to use materials that have explicitly religious content or are designed to inculcate the views of a particular religious faith; or (3) the inmates who participated in a sectarian program were treated more favorably than those who did not participate in a sectarian program. If the grant program involved indirect aid, a court that found persuasive the Eighth Circuit Court of Appeals' opinion in Americans United for Separation of Church and State v. Prison Fellowship Ministries, Inc., 509 F.3d 406, 409-26 (8th Cir. 2007), would likely find the inmates must have a genuine and independent choice between secular and sectarian programs to survive Establishment Clause scrutiny.
 4. The Transformational Justice Act, 57 O.S.Supp. 2007, §§ 521.1[57-521.1], 521.2, which provides for grants to volunteer organizations, including faith-based organizations, to provide health, educational or vocational training and programs that assist reintegration of inmates into communities, on its face, does not violate Article II, Section 5, or Article X, Sections 14(A) and 15, of Oklahoma's Constitution, because the grants are for a public purpose and we cannot conclude from the face of the Act that the State will receive inadequate consideration for the grant payments, so as to constitute gifts.
 5. Whether the Transformational Justice Act, 57 O.S.Supp. 2007, §§ 521.1[57-521.1], 521.2, as applied, violates Article II, Section 5, or Article X, Sections 14(A) and 15, of the Oklahoma Constitution is a question of fact beyond the scope of an Attorney General Opinion. 74 O.S. 2001, § 18b[74-18b](A)(5).
 6. Based on the court's language in Way v. Grand Lake Ass'n, 635 P.2d 1010 (Okla. 1981), a court would likely find the grant program established by the Transformational Justice Act, 57 O.S. Supp. 2007, §§ 521.1[57-521.1], 521.2, was constitutionally applied under Article II, Section 5, and Article X, Sections 14(A) and 15, of the Oklahoma Constitution, if the State actually receives adequate consideration in exchange for the Act's grant payments. To ensure the State receives consideration for grant payments, a court will likely look for conditions and governmental safeguards and controls to be in place to ensure the grantees are performing and the State actually receives adequate consideration for the aid it provides. See Way, 635 P.2d at 1015-17. *Page 13 
W. A. DREW EDMONDSON
ATTORNEY GENERAL OF OKLAHOMA
JANIS W. PRESLAR
Assistant Attorney General
[1] Section 1 (which names the Act) is not codified. 2007 Okla. Sess. Laws ch. 274, § 1. All other provisions of the Act are codified. Seeid. §§ 2, 3 (codified as 57 O.S.Supp. 2007, §§ 521.1[57-521.1], 521.2).
[2] In a recent Attorney General Opinion, we found the duties of the Reentry Policy Council did not include policymaking for the Department of Corrections and were consistent with the duties of the Board of Corrections to establish policies for the operation of the Department of Corrections. A.G. Opin. 07-37, at 239.
[3] The Legislature appropriated $100,000.00 for the Fund. 2007 Okla. Sess. Laws ch. 234, § 7.
[4] The Court made a distinction between "religious" organizations and "pervasively sectarian" organizations, saying the latter is one in which the organization's secular purpose and religious mission is "inextricably intertwined." Id. at 621 n. 16.
[5] Noting that this prong of the Lemon test had been much criticized over the years, the Court explained that cases that had found excessive entanglement had primarily involved aid to parochial schools which were "pervasively sectarian" and had "as a substantial purpose the inculcation of religious values." Id. at 616 (citations omitted).
[6] Section 5 of Article II of Oklahoma's Constitution is grounded in law which antedated and prompted the Establishment Clause of the federal Constitution. See A.G. Opin. 81-318, at 520. However, a plain reading of Section 5 shows it is more restrictive than the federal Constitution's Establishment Clause. See A.G. Opin. 83-227, at 424.
[7] The legislation provided for state aid from public moneys in the ratio of 1/5 of the actual cost of sustenance and care, while the institutions provided 4/5 of the cost from their usual income. Children'sHome Welfare Ass'n, 171 P.2d at 615 (Riley, J., dissenting).
[8] The legislation provided for the Association to (i) receive matching funds of one-half allowable expenditures based upon actual expenses, (ii) submit budget work plans and work programs, and (iii) submit to audits. Id. at 1013. *Page 1