## MURROW INDIAN ORPHANS HOME v. CHILDERS, State Auditor, et al.

No. 32620.   June 11, 1946.

171 P. 2d 600.

Julian B. Fite, of Muskogee, for petitioner.

Mac Q. Williamson, Atty. Gen., and James W. Bounds, Asst. Atty. Gen., for respondents.

BAYLESS, J. Murrow Indian Orphans Home, a corporation, has petitioned this court to assume original jurisdiction of its petition for mandamus, and upon consideration thereof to issue a writ to C. C. Childers, State Auditor of Oklahoma, and A. S. J. Shaw, State Treasurer of Oklahoma, directing them to audit, allow, and pay certain claims filed by said Home against the State of Oklahoma. It is asserted, and not denied by respondents, that the State Board of Affairs, acting under authority of House Bill 519, 1945 S.L. 437, made a contract with Home to care for certain orphan, dependent children; that Home has performed its part of the contract to the extent indicated in the claims filed; and, if the contract is valid, the State of Oklahoma is indebted according to the tenor of the claims. The above-named officials, upon advice of the Attorney General, have refused to audit, allow, or pay the claim for various legal reasons to be discussed later.

The parties have stipulated the facts here. It appears that the Home was established by those associated with the Baptist denomination, that its main control is by those affiliated with that sect, that it derives a substantial part of its annual support from that source although it receives the most of its support from other sources, and inmates of the Home are offered opportunities to attend church services and are encouraged to do so, most of them attending Baptist services although free to attend any church services they desire. Home makes no pretense of denying its religious background or sectarian character insofar as its organization and management is concerned, but does deny that it proselytes its inmates and insists its inmates are allowed complete freedom of worship. For the purposes of this action, it shows that its operation costs on an average of $225 to $250 per annum per inmate, resulting in a small annual deficit, whereas its contract with the Board of Affairs provides for an annual payment of about $70 per child entrusted to its care by the State of Oklahoma.

The state officials involved herein do not contradict the inferences drawn from the stipulated facts as above outlined. They rest their rejection of these claims wholly upon section 15, art. 10, and section 5, art. 2, Constitution of Oklahoma.

We do not discuss section 15 above in this opinion since our decision on that point in Childrens Home & Welfare Association v. Childers, 197 Okla. 243, 171 P. 2d 613, is upon the identical point, and what we say there applies here:

The most serious question is involved in determining the issues raised by consideration of section 5, above. Decisions

of this court are cited upon dissimilar issues that are said to be of controlling or persuasive influence. Decisions from other courts substantially similar are presented by both sides from which each derives satisfaction. Section 5 provides in plain language that no public money or property shall ever be appropriated, applied, donated or used, directly or indirectly for the use, benefit, or support of any church, or for the use, benefit, or support of any sectarian institution as such. This court construed that to mean that money raised by public taxes could not be used to pay for the transportation of students to parochial schools. Gurney v. Ferguson, 190 Okla. 254, 122 P. 2d 1002. Analysis of the problem presented in the Gurney Case shows that public money was being spent to furnish a service to a parochial school for which no corresponding value was received. However, since school districts are authorized to transport their students to the school buildings and this may be done by district owned buses or by contracts with others to perform the service for compensation, it is not likely that objection could be raised against a school district contracting with some third party, sectarian or secular, to perform this service. Presented in this aspect, there appears a complete distinction between the issue in the Gurney Case and this.

State cites and relies on Board of Commissioners of Logan County v. State, 122 Okla. 268, 254 P. 710, wherein it was held that the Constitution imposed upon the state the duty and burden of caring for and supporting the insane. In reaching this conclusion, the court cited and discussed section 1, art. 21, Constitution of Oklahoma. Its language is: " . . . the Legislature and the people . . . are hereby authorized to provide by appropriate legislation for the relief and care of needy . . . ". The mandate of section 1, art. 21, above, is that such institutions "shall be established and supported by the State", Board v. State, whereas in addition to the power reserved by section 36, art. 5 of the Constitution, the permissive

grant in section 1, art. 25, above, Bailey v. State, 194 Okla. 495, 153 P. 2d 235, is that such care and relief may be provided for by appropriate legislation. The Legislature or the people have a discretion in this matter, and may care for needy children through any scheme that seems appropriate to them, omitting, of course, to offend other constitutional provisions. Such a scheme may involve state-given institutional care or placement in the homes of private citizens, or contracting with eleemosynary institutions, or by grants of money, or combinations of these.

State-owned and supported institutions of the types mentioned herein are not without direct religious influences while avoiding the improprieties of sectarianism. Secular eleemosynary institutions observe this policy. Private homes are basically religious. None of these schemes could be rejected upon a plea such as this. It is not the exposure to religious influence that is to be avoided; it is the adoption of sectarian principles or the monetary support of one or several or all sects that the state must not do. Could these officials refuse to pay claims incurred by the keeping of needy children in private homes under contract where the state deliberately adopted the policy of placing children in homes observing the same religious principles as were practiced by the families from which the children came? We think not.

The circumstances under which public money could be given, applied, or appropriated to religious institutions without any return to the state, or could be so used as to make apparent the paramount purpose to support such institutions under the guise of receiving value in return, are known and can be recognized and can be stopped.

When the stipulated facts before us are considered in the light of these principles, we are of the opinion that the objections voiced to the payment of these claims fail. The state is fulfilling a duty to needy children. The institution can render a service that goes far toward the fulfillment of this duty, and

for a compensation that is a matter of contract and public record. The matter of the wisdom of the terms of these contracts is for the Legislature and the agency upon which it thrusts the performance of its commands, and so long as they involve the element of substantial return to the state and do not amount to a gift, donation, or appropriation to the institution having no relevancy to the affairs of the state, there is no constitutional provision offended.

We think that the denominational background and sectarian character of this institution is no barrier to the contract under consideration. The claims, not being otherwise questioned, are valid and should be paid.

The writ is granted.

HURST, V.C.J., and OSBORN, WELCH, CORN, and DAVISON JJ., concur. RILEY, J., dissents.

---

RILEY, J. (dissenting). It is said a new idea is painful, even to the intelligentsia, so I shall deal only with tragedies of history, also sometimes voluminous and burdensome. Union of church and state is often productive of religious strife, persecutions, and so, horrible to freedom. The reason for dealing with this aspect of history is that some say it can't happen here. The men who are Justices of the Supreme Court constitute the personnel of an instrumentality of government; they are expendable and so they may not be here if it does happen. The instrumentality and the free government, like Tennyson's brook, must go on forever. I shall not assume the role of a prophet, for I know only the brief epilogue of the state that is Oklahoma. All of this I saw and a part of it I was. At that juncture in the state's history when first the young manhood of it went forth in an effort to save, and did for a time, with the aid of others, save civilization — some of them to return covered with glory for their achievement as at the present time, but all

were infested with ideas and *cooties*. Nevertheless these returned soldiers sought to solve in the Western state and in officialdom the unemployment problem and to build here their homes.

The men and women thus returning found the state to be an armed camp. Race riots were the order of the day in Tulsa. Sanford v. Markham, 96 Okla. 156, 221 P. 36. Religious strife was rampant. Throughout the nation Jews and Catholics were proscribed by an organization then known as an invisible government. Some people of the state, thought to be of a subversive element, were flogged, and tarred and feathered. A governor was impeached, convicted, and removed from public office. Gunmen, representative of the first citizen, were jailed and convicted of crime. The military interfered to prevent the free exercise of the right of suffrage; civil power was subversive to the military. The Constitution provided the reverse should be true. The privilege of the writ of habeas corpus was suspended by the supreme executive authority, though the constitutional provision as to the writ without exception clause declared the privilege should never be suspended. There was then perversion of power subversive of civil liberty.

This Supreme Court, a bulwark of constitutional liberty and of government, thought the matter (Sanford v. Markham) moot or academic, and that no good would be served by a decision and construction of constitutional provisions. The case was dismissed.

The fiasco was subsequently repeated in part under another administration. Simpson v. Hill, 128 Okla. 269, 263 P. 635, 56 A.L.R. 706. Legislators, who were citizens, at the point of bayonets, were by the army of the state denied the right peaceably to assemble, in legislative chambers and to petition for redress of grievances. Pardons were granted to the convicts sentenced by judgments of courts and at the instance of legislators who would try the governor granting such pardons. For connivance, intrigue, and violence another

"good Indian bit the dust", and Justices for opinions of the law, almost followed suit. Simpson v. Hill (per curiam opinion).

The writer is without occult powers, but a burnt child dreads the fire. We can judge the purpose of public policy stated in constitutional provisions only by the rule of law, guided by the light of experience and history. Our judgments will contain an element of error as will legislative acts and administrations in government. It is human to err. Perfection is divine.

These provinces, as territories, were sown with dictators, some of whom cropped out in the fire bells campaigns. In re Initiative Petitions Nos. 112 to 118, etc., 154 Okla. 257, 7 P. 2d 868. It will be remembered that when that governor came to power, threatened to and did exercise authority not vested, that Constitutional authority, honored as he had been, was not impeached, *though he might have been.* Riley v. Carter, 165 Okla. 262, 25 P. 2d 666. In that administration great departments of state government existed with a consolidation of power and the supreme judiciary, manned with jurists to be paid from the public treasury a fixed salary for public service, were sought by legislative act, approved to be reduced to the status of dollar a year men.

These barbarous ancestors or leaders of men are passing on. Some of them are the last of the pioneer statesmen and deserving of honor and credit in the history of the state. Others of them, like creaking hinges, last the longest —they have a way about them long to endure in the abuse of historical truth.

Dictators, one by one, have toppled before the surge of the people in the exercise of their right of suffrage. The citizenship is liberty loving. Some insist on flying flags from public structures; they talk democracy; they write, speak, and vote their sentiments upon all subjects, despite propaganda, interference and suppression. Some know, or think they know, that only in so

doing may the hope of the state, and the promise of Bolivar, be fulfilled.

"The liberty of America is the hope of the Universe". The affairs of people are cast into the mold of history to enlighten us in our government. Judgments today in the matters presented in the proceedings at bar could achieve and secure our ancestors' Utopian dream, a democratic state, a part of a great republic dedicated to the doctrine of separation of Church and State.

It is unnecessary in these proceedings to "assume original jurisdiction". Original jurisdiction is thrust upon us and vested in the court of which we are members, sec. 2, art. 7, Constitution of Oklahoma, and this we determined last week in State ex rel. Bailey v State Election Board, 197 Okla. 167, 170 P. 2d 206.

The act under consideration, H.B. 519, of the Twentieth Legislature, 1945, provides that not more than $10,000 of the $50,000 sought to be appropriated for state aid in the private corporate and sectarian charitable enterprise may be spent for maintenance and supervision of the wards. By terms of the act, the State Board of Affairs is sought, not to be vested with authority to expend public moneys to the wards, but to the corporate and sectarian institutions to aid in their charities. This is in a measure union of Church and State. An expenditure by the Board of Affairs of the public money is contemplated by terms of the act in the amount of $40,000 for each fiscal year of the biennium for purposes other than maintenance and supervision of the wards in the private institutions and subject to their sectarian influences, and the money and credit of the state is, by majority sanction, to be paid to the corporate enterprise. But other such enterprises may not participate, for these expenditures are limited to such homes and institutions in existence for two years last past, inspected by the state agency and approved within the *total discretion* of the board.

The separation of the affairs of state from the realm of things religious and spiritual has a counterpart. It is *privilegium clericale,* by which at common law the clergy was exempt from all responsibility under both civil and criminal laws, to temporal courts. The growth and development during the middle ages of the privilege is an interesting chapter in the history of the controversy between secular and spiritual power. The limitation of the authority of the state over matters spiritual has been constitutionally expressed as a public policy by the state and federal governments. Such expressions, however, are shaped by the weakness or strength of individuals holding the reins of government, as well as by knowledge or lack of knowledge of the historical background giving rise to such constitutional provisions. The West Virginia State Board of Education et al. v. Walter Barnette et al.,319 U. S. 624, 63 S. Ct. 1178, 87 L. Ed. 1628, 147 A.L.R. 674.

Before the Norman conquest, and afterwards for many centuries, the clergy took an active part in the legislative and judicial branches of government. That was fusion of power secular and divine. Gentlemen of the cloth shaped the policy of government in many important respects. The educated class belonged to the clergy, and we owe it largely to the clergy that the Anglo-Saxon law left us any evidence of its existence at all.

During the Saxon period of superstition and ignorance, the ecclasiastical power had the ascendency, but it gradually declined as intellect and education became the common property of the masses. Bishops were then the principal members of the law courts, and they instructed the judges in both the spiritual and secular laws, and the ter Barnette et al., 319 U.S. 624, 63 S Ct. 1178, 87 L. Ed. 1628, 147 A.L.R. 674.

The question of ecclesiastical or lay jurisdiction gave rise to the most intense jealousies and contests between sovereigns and archbishops and lawyers, but the superior learning of the clergy resulted in a gradual encroachment by the Church upon the powers of the State. Glanville, lib. V, Ch. 6 and 9.

It was strange that the Church could so dominate the state, but in that superstitious period it held the terror of excommunication over the heads of temporal authorities and Boniface, Archbishop of Canterbury, in order to enlarge the power of the Church, ordained in 1261 that churchmen should ignore the King's summons for trial in secular courts. Bracton, De Legibus, lib. V, Ch. 11, 12; II Reeve's History of English Law, p. 344. With other bishops, he pronounced a sentence of excommunication against all who violated canonical law under enforcement of secular power, so that those around whom the Church threw its protecting arms were really held to be above and beyond secular law. Because *jure divine* was considered far nobler, extending to the soul, whereas the power of princes was limited to the body, over which, by a gradual encroachment, the Church exercised authority in aid of the State. It will be observed now that the State aids the Church.

As mind was superior to matter, the spiritual power controlled the body, but by terms of canonical decree "no power was given to laymen to judge God's annointed". Reeve's History of English Law, supra. And many references in the Bible were given to support the decree. "He suffered no man to do them wrong; yea he reproved kings for their sakes, saying touch not mine anointed, and do my prophets no harm." 1 Chronicles XVI; 15, 22; Kings XXVI:I; II Kings, 1.16.

With firmness the clergy claimed exemption for the persons of clerks from all secular interference. The laity generally indulged the claim, and Parliament, not being restricted as is Congress by the 1st Amendment, to "make no law respecting the establishment of religion, or prohibiting from exercise

thereof," by acts solemnly confirmed the exemption so that the privilege, though in fact an usurpation, was generously tolerated for what was considered the good of the realm.

The exemption was gradually extended until it applied to all who could read, the ability to read and write in that day being a mark of great learning, and the persons who enjoyed that accomplishment were called *clerica*, or clerks. Blackstone's 4 Com. 364, says that the privilege had its origin in the high regard paid by Christian princes to the Church in its infant state. However, the encroachment of the Church's power over functions of State extended to exemption of clergymen from punishment for crime. Bouvier's Dictionary, "Benefit of Clergy"; 1 Chitty, Cr. Law, 667; 1 Bishop's Cr. Law, sec. 622; 4 Blackstone Com. ch. 28. This exemption was engrafted upon judicial procedure and became a part of the English common law.

While the English common law was a product of the most enlightened system of jurisprudence the world has ever known, nevertheless its rules and doctrines, generally in accord with right and justice, were founded in the middle ages and were consistent with the scholastic thought dominating the period that indulged witchcraft, enchantment and sorcery.

Judicial procedure was made to be such that, after conviction for crime and before pronouncement of sentence and punishment upon the convict, when asked by the judge whether he had anything to say why judgment and sentence should not be pronounced upon him, the convict, on bended knee, could pray his clergy. If he did so, he was presented with the Psalter so as to be tested of his ability to read. The first verse of the Fifty-First Psalm was usually used, and it was because known as the "neck-verse". Webster's New Int. Dict. It was so designated because on the convict's ability to read was determined his fate. Littleton, 2 Inst. 164. Appropriateness of the verse is manifest: "Have mercy upon me, Oh God, according to thy loving kindness, according unto the multitude of thy tender mercies blot out my transgressions." So the clerica who proved themselves were delivered to the prelate, who were admonished by the statute of Westminister (25 Edward III, st. 3) not to liberate those delivered without putting them to their canonical purgation.

This privilege was abolished in England in 1825 (7 George IV, ch. 28, sec. 6) and limited in the United States by Act of Congress (April 30, 1790) to crimes not capital. The plea was sustained in South Carolina in 1855. State v. Bosse, 8 Rich. Law 276. James Otis successfully defended, by the plea, a Massachusetts soldier charged with murder in the Boston Massacre. The Federal Court sustained the plea in 1817 (U.S. v. Lambert), and 1938 (U.S. v. Jernegan). North Carolina indulged it in 1806 (State v. Gray, 5 N. C. 147; State v. Carroll, 24 N. C. 257), as had Virginia in 1795 (Commonwealth v. Stewart, 1 V. Cas. 114).

One of the most distinguished men known to have been accorded the plea was gifted Ben Jonson, the friend of "gentle Shakespeare" and the scholarly Lord Bacon. He was arraigned at the Old Bailey in October, 1598, for the manslaughter at Shordiche of Gabriel Spenser whom he had killed in a duel. When arraigned, Ben Jonson confessed the indictment, asked for the book, read like a clerk, was branded with the letter "T" (a scheme devised by Judge Tyburn, not for the purpose of punishment but for identification to avoid repetition of the plea for subsequent offenses), and was delivered according to the form of the statute. But, according to reports of the times, the wily Ben bribed the jailer to use a cold steel in branding him, as no mark was found upon his body at his death. Nothing of that kind, of course could be repeated in Oklahoma.

This anomaly in the administration of justice, recognized in England and

America until comparatively recent times, is an incident to the otherwise glorious achievement of the common law of England established as an institution of the "myriads who, before us, pass'd the door of darkness through". It has been cited to show the evils that arise as a result of any union of Church and State. Likewise, to show the purpose sought to be achieved by those who framed and adopted the Constitution of Oklahoma, including within its terms provisions designed to secure not only disestablishment of a state religion, but as well the widest separation of Church and State, which can only be had by prohibition upon extension of the powers of taxation of property devoted to religious purposes, and elimination of all enforcement of duties to the omnipotent by the civil powers and by consideration of constitutional prohibitions intended to prevent devotion of any public money to the enterprise of things religious and spiritual.

The welfare of the state is predicated upon the admonition to render unto Caesar the things that are Caesar's and unto God the things divine. The government should have high regard and deep respect for liberty of conscience and things divine. The state guarantees a "Perfect toleration of religious sentiment", permits "no religious test . . . for the exercise of civil or political rights" (sec. 2, art. I, Okla. Const.) under the concept all property devoted to religious purpose is exempt from taxation (Okla. Const. supra); and clergymen may claim exemption from jury service. All of this is based upon a consideration from which it may be expected that the clergy will afford to the state a standard of citizenship so requisite to preservation of our institutions in these modern times of abolition of the privilege of religious worship by some governments, deletion of and substitution for the Bible Text, and proscription of clerics by others. ". . . the policy of this state is . . . liberal towards exempting the property and income of charitable, religious, and benevolent organizations from taxation."

Oklahoma Tax Com. v. Sisters of the Sorrowful Mother, 186 Okla. 339, 97 P. 2d 888.

Usurpations by the Church in England upon the prerogatives of the state have been traced to show the reason for separatist movements. That movement can best be delineated by knowledge of men who were disciples of it. Roger Williams was one of these. No man ever had a clearer vision of the proper relationship of Church and State, nor of the fallacies and dangers of a totalitarian or authoritarian system of government, one that rules all men in all things both secular and divine, than he.

In America we have assumed, since adoption of the Bill of Rights, that "All we have of freedom all we use or know, this our fathers bought for us, long and long ago", and that liberties of American citizens are forever secure, but is it so? These inalienable rights within and without America are by statute and decisions and administrators being, every day, more and more regulated, restricted, and defined, and power and authority in and out of government is being more consolidated and fused. The West Virginia State Board of Education v. Walter Barnett, et al., supra.; Cope v. Childers, 197 Okla. 176, 170 P. 2d 210.

Roger Williams lived in times when Church and State were united in Europe and America, which meant that control of things spiritual and political was united in one authority, wherefore it mattered not whether the evil of dual control was in fact, exercised by the Church or State. He was a banished heretic at the age of 29, to become the founder of a new and independent government in Rhode Island which incorporated the ideals of its founder to extend to each individual, for the first time in history, full enjoyment of inalienable rights with complete individual responsibility in matters of conscience, to God, and accountability to the civil power only in matters secular. The pronouncements of this young man

marked the sinister trend apart from liberty and so impressed Jefferson that he designated the thought and his subsequent role in the drama as a part of his epitaph. That thought, by the 1st Amendment, became a part of the foundation of our great republic and was perpetuated in Oklahoma in full scope by the framers of government. It constitutes the philosophy of our ideology under which civil authority has no power in matters religious. The reason that Roger Williams was not ensnared by the spiritual followers of the Old World was his escape to America, where he successfully advocated universal suffrage, universal eligibility to office, frequent change of rules and religious tolerance of a "Free Church in a Free State", the Milton doctrine of schisms, which he had learned from his master, Sir Edward Coke, whom he served as secretary in the Star Chamber.

These doctrines were antagonistic to the aristocratic tendencies in Carolina, New York, the High Church of Virginia, the theocracy of Massachusetts and the monarchy in all America, but they are now accepted by the United States, and they lie at the bottom of all the democratic movements which are shaking the nations of Europe. Gervinus, "Price of Soul Liberty", p. 141.

To America the religiously persecuted of Europe fled. It was in Europe that half the wars and half of the internal troubles from the Monophysite controversies of the Roman Empire of the Fifth Century down to the Kulturkampf in the German Empire of the Twentieth, arose from theological differences and, according to Bryce, "Of all the differences between the Old World and the New, this is perhaps the most salient".

Monarchs abroad believed they ruled by divine right; that they were absolute in authority in all things, both temporal and spiritual. That conception of unity of authority plagued the last of the Kaisers. When he came to power it was in "consciousness of documentary right . . . united with a prodigious self-esteem and thus possessed by the idea that he was the instrument of God . . . (he) fell a prey to all the dangers of infatuation, of delusion . . . and so the Emperor-King, in his oath, swore only to his own actual authority to decide all vital natural questions 'to the best of my ability'." Ludwig, "William Hohenzolleran", p. 71.

Protestant reformers had previously advocated religious liberty, but only for their own sect; not for all men. After achievement they formed alliances with the State; became advocates of the State power to eradicate heretical doctrines. They thought that unless the State had a religion it would be a Godless government; that the State's power was necessary to preserve the Church from pernicious religious views.

Roger Williams was the only exception among early protestant reformers, but he found to his dismay that among the Puritans of the Bay Colony the magistrate and the clergy were expected to destroy "all false service to God". He decried toleration as a mere grant; insisted upon liberty of conscience, as an inalienable right, which no earthly power had right to abridge. As a prophet preaching a "treasonable and damnable heresy", he was banished, for Williams was not in his element there, to become a statesman and champion of a new conception of religious liberty, one of separation.

According to the new conception the magistrate owed to false worshipers (1) permission and (2) protection. This thought was incorporated in the Rhode Island experiment of 1663 to become 136 years later a principle of Federal government. That principle not only embraces liberty of conscience, but equally denounces *financial alliance between the Church and the State;* it inhibits taxation for the benefit of the Church; it recognizes that, as against the Church, the power of taxation is the power to destroy. State aid to sectarian institutions carries with it no antidote for the destructive elements to which the people's government is subjected.

This apostle-statesman learned these lessons because he lived in a period when bigotry and intolerance made war against independence of thought; at a time when whatever religion, whether Catholic or Protestant, happened to be adopted by the State, individual religious opinions were stifled; when no man could call his soul his own; and when the body existed only for the benefit of the State.

He knew that Henvy VII found and left the kingdom popish; that Henry VIII cast it into a mold half popish, half Protestant; that Edward VI brought forth an edition all Protestant; that Queen Mary defaced Edward's work to return to the view of her grandfather, and that at Mary's death all religion died too, only to be revived by Elizabeth in Edward's model—all Protestant. It was evident that whenever the conscience was controlled by civil authority, civil and religious liberty were destroyed. It is evident that whenever religious dogma or opinions of dissidents are edited by agencies of the state or majorities, the dissidents are considered guilty of sedition and prosecuted or persecuted as such.

It is only by adherence to our constitutional provision with its full spirit of liberty of conscience that our government may avoid the errors and delusions that have led astray the states of the past.

It is interesting to note the cause of Roger Williams' revolt from the State Church of the mother country and his departure for the new world. In England, nonconformists or Puritans under James I were severely persecuted. Many of the Puritan sect were, at Newgate Prison in Smithfield, burned at the stake. There Williams became a Puritan, despite all parental entreaties to turn "the erring child from his dissenting ways." Roger had a mind of his own. He grew up in the stimulating environment where Shakespeare finished his works and died, where Lord Bacon revised his essays which the youngster used in defense of religious principles. He was a student under Sir Edward Coke, who in defiance of the royal authority wrote the "Institutes," no classic in common law, and was the successful counsel in "Shelly's case," and who, under the reign of King James, in an effort to stem the tide of liberalism, was sentenced to the tower.

Roger Williams had written his "Dissent" against Bishop Laud's formal service provided in the Book of Common Prayer. So, to avoid punishment consisting of torture, disfigurement and imprisonment, the "Apostle of Soul Liberty" fled to America. Of this unusual man it was said his conscience impelled him, when he discovered a truth, to proclaim it; an error, to expose it; an evil, to try to remedy it; a good, even to his enemies, to do it. Judge Durfee.

He had just witnessed in England, at the instance of Archbishop Laud, President of Cambridge, the persecution of Doctor Leighton because of nonconformity, and execution of the ecclesiastical sentence against the man, of a fine of 10,000 pounds, degration from the ministry, pilloring and whipping, "one of his ears cut off, one side of his nose split, and branded in the face with a double "SS" for a sower of secition," then he was pilloried a second time, with like disfigurement to the other side of his face and then shut up in prison for the rest of his life. He knew that the Duke D'Alva boasted that 36,000 Protestants were put to death by him, and that in the reign of Queen Elizabeth this was sought to justify similar persecution of the *papists* and banishing the *Jesuits* in 1586 in the Low Countries.

Roger Williams had not come to America to place his head in an ecclesiastical noose. He declined the call to the Bay Colony Boston Church because of connections that church had with the Church of England and because the church would not deny the "power of the civil magistrate to punish any breach of the first table" of

the decalogue and declare itself in favor of the principle of the separation of Church and State. The whole system of the "Holy Commonwealth" was based upon the Bible; it was their statute. The Ten Commandments, as a whole, constituted the warp and woof of the social fabric to be administered alike by the clergy and magistrates. The Puritans believed that if the first four commandments were violated (purely offenses against God, and not punished by the State), religion would be disturbed and civil society would cease to exist. The Constitution is the State's moral law.

Williams was hounded at Salem; he sought refuge at Plymouth, where he made friends with the Indians and laid the foundation for the establishment of Rhode Island. But in Plymouth the Pilgrims had union of Church and State as a government theocratic in form. Williams returned to Salem, where controversy ensued with the Boston Church that gave no quarter to dissenters, but believed it a duty to see that all men obeyed "the inexorable will of God" *as the theocracy interpreted* it. *Theocracy and oligarchy combined* then and made use of the whipping post, confiscation and banishment to enforce the idea of the will of God. They believed, as Cotton Mather expressed it, "There was a whole country in America likely to be set on fire by the rapid motion of a windmill in the head of one particular man." In 1634 a resident oath was required of all Bay Colony residents; the purpose was the eradication of all opposition to the "Holy Commonwealth," and the penalty was banishment. The government became authoritarian.

Williams was summoned to trial for entertaining "dangerous opinions" over which, with twenty-five magistrates and the ministers of the Bay Colony, Governor Haynes presided. The court was inquisitorial in matters, original and final in jurisdiction. Roger Williams was convicted, but allowed an opportunity to recant. In the "rocky strength" of his convictions, he declined and based his views upon the demarcation between duties owed to Caesar and obligations to God. The lack of observance of which had been the root cause of all religious persecution and bitter experience in religion.

The court's sentence of exile, instead of being the doom of religious liberty in America, was its harbinger. It made the opportunity to establish a model republic, to afford an asylum for the oppressed of America and Europe, where all would worship in harmony with the dictates of their conscience. History of the U. S., Bancroft, Vol. 1, p. 282.

When Governor Endicott of Massachusetts determined upon a more liberal policy and invited Roger Williams to return from his experiment, he made the memorial reply "I feel safer . . . among the Christian savages . . . than among the savage Christians. . . . He thus wrote the Cromwellian thought that it *"is ingenious to ask liberty and not give it."* Nevertheless this ideal of total separation of Church and State has never been completely accomplished, even in America. We have not fully conceived that "the civil commonwealth, and the . . . church are not inconsistent, though independent the one of the other." We know that compulsory taxation of everybody shall not be in any part to support religion or Church or sectarian institutions, for the Constitution says so. Roger Williams and Jefferson were condemned as heretics, but the philosophy of liberalism endures:

"For Humanity sweeps onward; where today the martyr stands,
On the morrow crouches Judas with the silver in his hands;
For in front the cross stands ready and the crackling fagots burn,
While the hooting mob of yesterday in silent awe return
To glean up the scattered ashes into history's golden urn."

"True religion never knocks at the door of Caesar's chamber for legislative sanction; if government is to keep

out of the realm of religion, the church must keep out of the arena of politics." Longacre. Charity is governed by like rules.

When the Convention in Philadelphia in 1787 left the issue of establishment or disestablishment of a State Church untouched, the people of Rhode Island refused to ratify the Constitution, three years passed by after all other states had ratified the document, and it was not until Jefferson said in aid of the amendments, "You have protected the government from the people, but what have you done to protect the people from the government?" And it was agreed to sever the Gordian knot by adoption of a Bill of Rights and Rhode Island, on May 29, 1790, entered the Union. Thus it seemed that the escape and accomplishments of Roger Williams was within a protective power:

"Careless seems the great Avenger; history's pages but record

One death grapple in the darkness 'twixt old systems and the Word;

Truth forever on the scaffold, wrong forever on the throne—

Yet that scaffold sways the future, and, behind the dim unknown,

Standeth God within the shadow, keeping watch above His own."

Religious activities in propagation of doctrine in an effort to convert individuals by persuasion to a religious life by various means inclusive of Hymns of Praise are meeting with numerous governmental aids and these efforts of control statutes, ordinances, and administrative regulations restricting religious endeavors and requiring patriotic symbolism and formulism as a part of state educational curricula are commonplace. Sectarian institutions may rue the day they sought adjudication of the validity of such laws, for by such statutes religious institutions may again yield to pay increased homage "to Caesar." Such statutes may enlarge the powers of the state to place restraints upon human conduct and endanger civil and religious liberties. Not so, however, if judges and courts appreciate fully the magnitude of the human equation in jurisprudence. It is with difficulty that precedents, made by erroneous decisions, are eradicated.

A license to do a thing, or aid in doing it, recognizes that the thing may be prohibited or that the consideration may flow the other way, and it is axiomatic now that "the power to tax is the power to destroy." The matter of governmental restraint upon religious practice and aid of it is a *variant*.

The people may not be taxed in any part, against their will, for the support of a religion, the tenets of which are not acceptable to a large number. Lovell v. City of Griffin, 58 Sup. Ct. Rep. 666; Hague v. C.I.O., 59 Sup. Ct. Rep. 954; Schneider v. State, 60 Sup. Ct. Rep. 146; Cantwell v. Conn., 60 Sup. Ct. Rep. 900; Cox v. New Hampshire, 61 Sup. Ct. Rep. 762. At the present time the magnitude of governmental expenditures for economic security and national defense has required the extension of the taxing powers, as it is in this field of federal, state, and municipal taxation that occurs most of the current litigation involving the respective rights of Church and State. (Jones v. City of Opelika, 62 Sup. Ct. Rep. 1250). The Supreme Court of the United States considered taxation on sales of religious literature and the court by a majority of the justices sustained the power to tax, upon the theory that the religionists used the ordinary commercial methods of sale by solicitation and canvassing, and that these activities were subject to reasonable controls. The dissenting justices thought permissible the cost of regulation, but not a tax for revenue as being burdensome to the church. In other words, they thought that the church or its practices could not be taxed, directly or otherwise.

In Oklahoma, we do not know the extent that exemption upon religious, benevolent and charitable property relieves it from the burdens of govern-

ment, but we do know that magnificent office buildings in each of the twin cities of the state were sought to be eliminated from the tax rolls because of ownership by societies and devotion of profits to the use of such organizations. The Perrine case settled the matter.

In the smallest state of the Union, Rhode Island, in 1930, there was exempt from taxation property owned by charitable and religious bodies of a value of approximately three billion dollars. And though Jesus said "My kingdom is not of this world" and though the state power to tax such property, directly or indirectly, may burden or destroy these things devoted to the mind, yet with enlarging governmental deficits, state and national indebtedness may become so great that to maintain solvency, the power of taxation may enter by amendment or otherwise, *many virgin fields.* Under constitutional provisions, as herein set forth, this court should be, as Lord Birkenhead suggested, *"a great breakwater against ill-considered and revolutionary change."* But it may be recalled also that Mr. Cooley said "The constitution is what the judges say it is." By the precedent of ill-considered opinions, our federal and state constitutional provisions on the subject may become "all sail and no anchor" (Lord Macauley), to the irreparable damage of the State and the Church.

When it is seen that the highest federal judges are themselves about equally divided on questions of governmental control of external religious practices, it may be thought with some degree of accuracy that the American people are *"basking in a mirage of constitutionalism, believing they have protections which in fact do not exist."* The reason such protections do not exist is because, in fact, *this is a government of men and not of laws.*

In the "Flag Salute Case" (City of Minersville v. Gobitis, 60 Sup. Ct. Rep. 1010), and in the "Case of Taxation of Religious Literature" (Jones v. City of Opelika, supra), the four federal judges in the lower court were unanimous in holding that religious liberty had been violated, but in the Supreme Court eight Justices disagreed and the late Chief Justice Stone alone dissented; but by the time the taxation case reached the Supreme Court three of the majority had recanted (62 Sup. Ct. Rep. 1251) in the flag salute case, and thus of all judges passing on the question, the equation was eight to eight. In the Supreme Court the ratio was five to four. In the meantime, one of the Justices resigned, and the newly-appointed Justice tipped the scales, in time of peril, in favor of liberalism. Thus, under the Federal Constitution, in this field of jurisprudence, we may be said to have a government of "men" and not of "laws." The situation is unavoidable, and not so unfortunate or unforeseen. The opinions are judicial and not personal matters.

The first American, Benjamin Franklin, foresaw, and said: "Governments, like clocks, go from the motion that men give them, and as governments are made and moved by men, so by men they are ruined too." And, after all, a "confused confounded" situation, judicial, legislative, or administrative, is dependent upon right-minded men who have knowledge of law, will proclaim it, and are disposed to obey it.

George Washington, in view of governmental protection of the person and conscience of men from oppression, said:

". . . It certainly is the duty of rulers, not only to abstain from it (oppression) themselves, but according to their stations to prevent it in others."

The principles herewith involved are:

(a) Legislators should be disposed not to enact laws restrictive of the proper exercise of religious practices, or the use of property or public money for that purpose. I would hold the act void.

(b) True religion and charitable practices should and will be highly regarded by officers who interpret the American doctrine of separation of Church and State, and by right-minded people.

In my opinion there is no analogy between spending public money for care of orphan or undreprivileged people in private homes and the expenditure of public money to corporate, or sectarian, associations organized and devoted to charitable purposes.

I find great contrast in the rule of this court now promulgated and in Gurney v. Ferguson, 190 Okla. 254, 122 P. 2d 1002, involving the transportation by public school bus of pupils along the way to parochial schools (Catholic). It is believed the diverse rules cannot endure. We cannot make fish of one and fowl of the other. In both cases the argument was advanced that expenditure of the money or use of the property was for the benefit of the child and not the sectarian institution. Our former decision turned on the prohibited use by indirection. The present expenditure is of public money *directly* to be paid, under majority opinion, to sectarian (Baptist) and corporate charitable associations and institutions.

In view of my opinion, it is not too much to say no reflection is intended upon the faithful. My father, now gone to his reward, left his house in Alabama, a Baptist. He was a passenger on the first train to enter Fort Worth. He married a miss from Mississippi, a Methodist, and placed his faith and title to his religion in his wife's name. Where the land is the blackest and the people the whitest, God blessed that union with me in the midst of the Cleveland Panic—I was no financial asset. In the Indian Territory and later in the short-grass, Kiowa and Comanche County, these Methodist pioneers were prairie Christians. Like many of the period,

their lives inspire to high endeavor the light to give forever.

Respectfully, I dissent.