CHILDRENS HOME & WELFARE ASS'N et al. v. CHILDERS, State Auditor, et al.

No. 32652. June 11, 1946.

*171 P. 2d 613.*

George H. Bowen and Benjamin C. Conner, both of Tulsa (Clay Tallman, of Tulsa, of counsel), for petitioners.

Mac Q. Williamson, Atty. Gen., and James W. Bounds, Asst. Atty. Gen., for respondents.

BAYLESS, J. Upon petition of Childrens Home and Welfare Association, a corporation of Tulsa, Oklahoma, this court assumed original jurisdiction for the purpose of determining whether to grant the petition for a writ of mandamus directed to C. C. Childers, State Auditor, and A. S. J. Shaw, State Treasurer, directing them to audit, allow, and pay certain claims filed by said Association against the State of Oklahoma. It is asserted by petitioner, and not denied by respondents, that the State Board of Affairs, acting under authority of H.B. 519, 1945 S.L. 437, made a contract with Association to care for certain orphan children at a specified monthly rate; that Association has performed its part of the contract to the extent indicated in the claims filed; and, if the contract is valid, the State of Oklahoma·is indebted according to the tenor of the claims. The above-named officials, upon advice of the Attorney General, have refused to audit or allow or pay these claims for the reason hereinafter discussed.

It is conceded that Association is an Oklahoma corporation organized as a charitable body and without profit motive, for the purpose of establishing and maintaining in the city of Tulsa a home for dependent, neglected, and destitute minor children; and that it is entirely secular and free from the control or domination of any sectarian organization. The state officials based their rejection of these claims upon the

premise that section 15, art. 10, Constitution of Oklahoma prohibits the giving, pledging, or lending of the credit of the State of Oklahoma to any association and forbids the state to become a stockholder in or to make donation by gift, subscription to stock, by tax arrangements or otherwise to any association.

The issue presented here was also presented in No. 32620, Murrow Indian Orphans Home v. Childers, 197 Okla. 249, 171 P. 2d 600, in connection with other legal objections to the payment of claims involved in that case. Some of the discussion in that opinion with respect to the state's duty and policy in this matter is applicable to this issue and will not be repeated herein.

Conceding the duty of the State of Oklahoma to care for orphan children, and recognizing the discretion which the Legislature has vested in the Board of Affairs for the handling of this matter, the primary question then remains as to whether section 15 above is violated by the contractual arrangements made. It must be obvious without further discussion that these contracts do not involve a gift or pledge or loan of the state's credit, nor do such contracts amount to a subscription to the capital stock of the corporation or a special tax arrangement for its benefit. No argument is made to this effect. There is left, then, simply the contention that these contracts amount to a donation or gift or arrangement described as "otherwise" to this Association, all being synonymous.

This court had occasion to define the term "gifts" which fall under the ban of section 15, above, which definition is not contrary to our view herein. In Hawks v. Bland, 156 Okla. 48, 9 P. 2d 720, we said that such gifts were "gratuitous transfers of property of the state voluntarily and without consideration." Following this thought we conclude that where the state receives property or service in return for the payment of its money, even though such payment by the state be voluntary in the sense that the contract whereunder the money was paid was voluntarily entered into, it is not to be treated as a gift. See, also, Carter v. Thomas, 172 Okla. 558, 46 P. 2d 460. It is not necessary to enter into an extended discussion of the service that is rendered to the State of Oklahoma by Association in taking and keeping and caring for the orphan children involved in this contract, but to the extent that Association renders this service to the State of Oklahoma it is furnishing the state a valuable consideration sufficient to support the payment to Association by the state of the state's money raised by public taxes.

The writ is granted.

HURST, V.C.J., and OSBORN, WELCH, CORN, and DAVISON, JJ., concur. RILEY, J., dissents.

---

RILEY, J. (dissenting). The State Auditor's rejection of the claim filed herein by the corporation was under the advices of the Attorney General. The Attorney General's advices were based on the prohibition of section 15, art. 10, Constitution. So, the issue presented in the proceeding at bar is whether the Twentieth Legislature, as evidenced by its enactment of H.B. 519, was empowered to change the existing public policy of the state in administration as to eleemosynary institutions so as to depart from the past and previous state policy of governmental ownership, control, and support from taxation of such institutions, to embrace a new policy of state aid from public revenues to such private, corporate, or sectarian institutions heretofore supported by money and property derived from private sources and devoted to these collective, corporate, and sectarian charities.

The Whitaker State Orphans Home exemplifies the one character of state-owned, controlled, and supported institution, whereas the numerous petitioners at bar represent the other kind of institutions founded by illustrious

philanthropists and heretofore supported by charitably and religiously inclined public benefactors. Doctor Murrow was the founder of the institution under consideration in the allied case.

The sectarian institutions are entitled to the credit for having reduced the expenditure of public money from the State Treasury for the charitable purpose. The state institution above mentioned is now caring for 275 children. The 15 privately-owned and controlled corporate and sectarian institutions are caring for 1,000 orphans, destitute, and dependent minors.

The act contemplated and purported to provide state aid from public moneys in the ratio of 1/5 of the actual cost of sustenance and care for the underprivileged thousand minors. The sectarian and corporate petitioners afford, from private charities, the balance of the 4/5 cost from their usual sources of income.

The new order, commenced in 1932, the legality of the new public policy presented, the issue in the case at bar, has not heretofore been considered by the courts. The petitioners in these original proceedings seek exercise of the original jurisdiction vested in this court by the issuance of a writ of mandamus to compel the State Auditor and the State Treasurer to audit and pay the claims approved by the Board of Affairs and filed with the State Auditor, aggregating $70 per capita per annum, for care and maintenance of the 1,000 underprivileged children in the nonprofit, charitable, corporate institutions, some of which are sectarian and some of which are not, situated at Tulsa and throughout the State of Oklahoma. These institutions are devoted to dependent, neglected, and destitute children.

$100,000 is sought to be, or is, appropriated by the act, for the biennium, to aid the private charities of the institutions under the management and control of the boards of the corporate enterprises, and these institutions are neither owned nor operated by the state.

The claims filed and disallowed are based upon contracts executed by the Board of Affairs. The contracts in the instant case are dated July 1, 1945. The petitioner in the case at bar has under its care children, 47 in number. The contract claim per capita is $5.36 per month, or $64.32 per annum. Consequently, the sum total to be paid the corporate petitioner is in excess of the amount allowed by the Constitution, sec. 1, art. 25, $30 allowed to be paid to any indigent person, such as old age pensions.

But the petitioner has performed under the contract from July 1, 1945, to date, and petitioner promises performance until the end of the fiscal year, June 30, 1946. The claim filed and approved by the Board of Affairs is in the sum of $251.92 for the month of July, 1945. This claim, with others, has been and will be disallowed and like claims will be disallowed for the months of August to and including December, 1945, and from the month of January to and including June, 1946.

Petitioner alleges a contingency and emergency devolved upon the State of Oklahoma as to the care and custody of the minors involved and housed in the privately-owned and managed corporate institutions, 15 in number throughout the state and said to be similarly situated.

Otherwise, it is pleaded these children would be ill-housed, ill-fed, and ill-clothed. There is in this case an entire absence of pleading and proof as to the moral and spiritual training of these 47 children involved. Nevertheless, the issue presented is one of morals in government, requiring a legal analysis of true charity, which is the giving up of wealth or stores belonging to the donor for the amelioration of the condition of the donee. This court is required to determine whether this is a case of robbing Peter to pay Paul.

House Bill 519 fuses and consolidates legislative and administrative powers

of government. The funds of the corporate state are, by the purported appropriation and administration, commingled with the funds of private charities so as to bear the total expense and cost devoted to the public welfare.

Indubitably the relative material cost to the state by this new order and system involved in this new public policy is lessened in the ratio of one to five. However, the philosophy of the law and the prohibition of Constitution is the legal issue before the court and it has been resolved by the majority on an economic basis and the political issue or public policy in government of the state is determined accordingly.

The Oklahoma Home and Welfare Association achieves no material gain, for all it has or acquires goes into the cost and maintenance for the payment of salaries and the like of the charity under its management. Does the corporate state suffer detriment or is the noncharitably inclined citizen, as a part of the people and therefore of the state in fact, coerced under the proffered public policy for the support of the charities and for the cost of the public welfare? May such minority be considered in the construction of the constitutional provision affirmatively requiring the state "to establish and support" such institutions (sec. 1, art. 21, Const. of Okla.)? Board v. State, 122 Okla. 268, 254 P. 710; Bailey v. State, 194 Okla. 495, 153 P. 2d 235. Does the constitutional prohibition that "The credit of the state shall not be given to any . . . corporation, or association . . . nor shall the state . . . make donation by gift . . . or otherwise, to any . . . association or corporation" (sec. 15, art. 10, Const. of Okla.) have significance as to the merit of these proceedings involving a gratuitous transfer of public money resting alone upon an equitable consideration which in the mind of a generous or just individual dealing with his own money might induce him to recognize the obligation to the unfortunate and to a charitable enterprise, worthy of reward? Hawks v. Bland, 156 Okla. 48, 9 P. 2d 720; Carter v. Thomas, 172 Okla. 558, 46 P. 2d 460.

Herein the petitioner rendered great service to the individual orphans and underprivileged children, 47 in number, who otherwise would have been subject to the state's consideration as to this segment of the people of this state.

A charitable consideration flowed from the petitioner's performance but not to the corporate state itself, for from charity no consideration on this earth is by the donor derived. The donor stores up for himself treasures in Heaven.

The petitioner aided the state by the private corporation and sectarian charity. Its accomplishment was for the public welfare. Petitioner and others similarly situated as volunteers now seek equitable considerations and financial contributions from the public treasury under custody of officers of the corporate state. A part of the expense of the charities is sought to be paid from public moneys within the State Treasury. The authority of state officers to pay the public moneys is limited by a constitutional indenture restricted in its terms.

It is urged that petitioner's services were not voluntary but rendered as a result of contracts entered into by the Board of Public Affairs with the charitable corporate and sectarian institutions and that these contracts were in accord with the provisions of statute (H. B. 519, supra) and that the statute exists and is within provisions of the Constitution. Sec. 1, art. 25.

We may as well examine the constitutional provision as a grant of power together with the limitation and its relation with prohibitions in other articles and sections of the Constitution contained.

The welfare provision of the Constitution is in section 1, art. 25. For security and benefit, legislative authority

is granted and exists to appropriate money from the State Treasury for relief and care of needy persons, immature, disabled, and the old. Those in extremis and unable to care or provide for themselves may, by legislative provision, be the recipient of direct and personal contributions from appropriations made from public moneys. But a limitation is provided by that constitutional authorization. By the use of asterisks the limitation is excluded from the quotation contained in briefs presented in the case at bar. The limitation curtails the amount of payment that may be made to any one individual or person. By statute, a corporation is a person created by law. And so the limitation annexed to the grant of power and authority for the welfare of any one person, approximately, has the financial state aid that may be given to the corporation. The legal equation is thus divided as well as the extraction from the public treasury as sought.

In paramount law and apart from equitable equations involved in consolidation of legislative and administrative powers constitutional considerations of appropriations and administrations for the public weal require cognizance not only of section 15, art. 10, supra, but as well section 1, art. 21, Const. of Okla., requiring the state, as such, to establish and support its own "institutions as the public good may require," the support of them to be "in such manner" "as may be prescribed by law." Bailey v. State Board of Public Affairs, 194 Okla. 495, 153 P. 2d 235; Board v. State, 122 Okla. 268, 254 P. 710. These cases deal with permissive authority of the Legislature and restrictions upon that permissive authority.

Of necessity, the issue before this court is relegated to another constitutional prohibition applicable to the legislative and administrative authority, but before consideration is given to it which involves the payment of public money, we may as well consider too legislative and administrative powers in general.

The authority of the Legislature extends to all rightful subjects of legislation. Not so as to the executive or administrative power. In the states the residuum of power is in the Legislature or reserved to the people. The executive and administrative power is a limited authority and it must exist and be exercised within the law. Otherwise, the administrator and the executive is stymied. Rightful subjects of legislation are not all-embracing nor unlimited. The Constitution contains 64 restrictions upon the legislative authority and some rights of the citizen, irrespective of the restrictions, are inalienable (Declaration of Independence). The citizen has private rights not subject to regulation or control by government. These are relative rights extending to liberty of the person and to his rights in property. The one may be a matter of conscience or of religion or of suffrage. The other is a right of possession and of use of things tangible and intangible, real or movable and therefore personal. Public money is personal property and may not be derived from the individual by tax upon him nor expended except for a public purpose. The citizen may not be divested of either real or personal property by law unless by reason of necessity such property is required for the good of all. Even then, the citizen is entitled to the due process of law and an adequate consideratoin for his property at the time of the taking of it from him for the common weal.

No contract and no divesture of public or private property, real or personal, is valid unless at the time there is a consideration promised or paid. There is no present consideration here to the corporate state, but only a consideration to a segment of the people, the underprivileged children. The state's consideration rests in a voluntary performance by petitioners together with their hope of an equitable consideration by the courts and a prom-

ise of it by a void legislative act seeking to make an appropriation and an administration of the purported public policy at variance with constitutional requirements on the part of the Board of Affairs.

In ye olden times there was a Constitutionalism. It was of the Nineteenth Century. Constitutionalism was the paramount law, but, alas, now we have an administration for the general welfare and said, within the equitable consideration, to be in aid of the public purpose.

"To define what constitutes public purpose for which (money derived from taxes) may be lawfully (expended) is a task of some difficulty"

as this court well knows. Cope v. Childers, 197 Okla. 176, 170 P. 2d 210. The arresting of administrative proceedings for the allocation and expenditure of public funds and the establishment that the expenditure is for purposes devoid of all public interest is well nigh an impossible judicial task. Cope v. Childers. And in the absence of determination by the courts of the invalidity of such appropriations the diversion of public moneys must be so clear and palpable as to be immediately perceptible to the minds of a majority of men constituting a court of justice and of last resort.

Such a diversion of public money, consolidating legislative and executive power, is not always perceptible at the time of sequestering the funds and can only be perceived by some at the time of administrative determination of the object of the expenditures. Wells v. Childers, 196 Okla. 339, 165 P. 2d 358; Cope v. Childers, supra.

State charity, though a gratuity, will support a tax and an expenditure of public funds. State ex rel. New Richmond v. Davidson, 114 Wis. 563, 90 N.W. 1067, 58 L.R.A. 739; Ingleside Ass'n v. Nation, State Auditor, 83 Kan. 172, 109 P. 984, 29 L. R. A. (N.S.) 190. But herein this court is concerned with public money or credits of the state, derived from taxation and sought to be applied and used directly and indirectly for the benefit and support of (sec. 5, art. 2, Const.) "a corporation or association" (sec. 15, art. 10, Const.) devoted to charity and to the public welfare.

In this proceeding the prohibition of section 15, art. 10, Constitution, supra, denies relief by the extraordinary writ of mandamus to be issued at the instance of those who for laudable purposes and charitable motives have relieved distressed humanity and in an associated and allied cause, Murrow Indian Orphans Home v. Childers, No. 32620. Section 5, art. 2, Constitution of Oklahoma, denies the relief to the sectarian institution, a corporation engaged in private charity for the public good. And this is for the reason that by the constitutional prohibition "money or property shall not be appropriated, applied . . . or used, directly or indirectly" for the private, corporate, or sectarian charitable purposes. The public moneys shall not be "given . . . to any . . . corporation, or association" of the kind nor shall the state otherwise by tax or the proceeds from taxation participate as a donor or subscribing or supporting party, for the reason that the burden as to state charities is upon the state to "establish and support such institutions" itself.

This is in accord with our decision in the school bus transportation case, wherein the issue was presented that the use of the property, the bus, was for the benefit of the pupils to be transported to parochial schools as the Legislature had by statute provided. This is uniformity of law. I think this is the judgment of higher law. At any rate, it is my written opinion of the higher law in a matter judicially presented to the court of which I am at this time a member.